# EXHIBIT B



## Service of Process Transmittal Summary

**TO:**     Tonya Anderson
JPMorgan Chase Bank, N.A.
700 KANSAS LN
MONROE, LA 71203-4774

**RE:**     **Process Served in Washington**

**FOR:**    JPMorgan Chase Bank, N.A.  (Domestic State: N/A)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | In re: JOHN R. WILSON, a married man, and JACQUELINE M. WILSON, a married woman vs. JPMORGAN CHASE BANK, NATIONAL ASSOCIATION |
| **CASE #:** | 2320314231 |
| **PROCESS SERVED ON:** | CT Corporation System, Olympia, WA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 05/01/2023 at 15:26 |
| **JURISDICTION SERVED:** | Washington |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 05/02/2023, Expected Purge Date: 06/01/2023 |
| | Image SOP |
| **REGISTERED AGENT CONTACT:** | C T Corporation System 711 Capitol Way S Suite 204 Olympia, WA 98501 800-448-5350 MajorAccountTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

 Wolters Kluwer

# PROCESS SERVER DELIVERY DETAILS

**Date:**       Mon, May 1, 2023
**Server Name:**     Drop Service

| | |
|---|---|
| Entity Served | JPMORGAN CHASE BANK NATIONAL ASSOCIATION |
| Case Number | 2320314231 |
| Jurisdiction | WA |

| Inserts | | |
|---|---|---|
| | | |



1   John Wilson, ProSe, T: 206.854.6851, E: john.wilson.udi@gmail.com
2   19318 99ᵗʰ Ave SE, Snohomish, WA 98296



FILED

APR 28 2023

HEIDI PERCY
COUNTY CLERK
SNOHOMISH CO. WASH.

4   **IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**

5   **FOR THE COUNTY OF SNOHOMISH**

6

7
8   In re:                                                )        **23  2  03142  31**
    JOHN R. WILSON, a married man, and                    )
9   JACQUELINE M. WILSON, a married                       )        Case No.
    woman,                                                )
    Plaintiffs, vs                                        )        **SUMMONS**
10                                                        )
11  JPMORGAN CHASE BANK, NATIONAL                         )        **COMPLAINT FOR DECLARATORY**
    ASSOCIATION, a subsidiary of JPMorgan                 )        **JUDGMENT AND OTHER RELIEF**
12  Chase & Co., Inc., a Delaware Corporation,            )        **UNDER THE DECLARATORY**
    QUALITY LOAN SERVICE CORP. OF                         )        **JUDGMENT ACT, RCW 7.24, AND THE**
13  WASHINGTON, a Washington Corporation,                 )        **CONSUMER PROTECTION ACT, RCW**
                                                          )        **19.86, AND THE WASHINGTON AND**
14  JOHN DOES 1 through 20 to be named later              )        **UNITED STATES CONSTITUTIONS**
                                                          )
15                                                        )
                                                          )
16                Defendants                              )
                                                          )
17  ─────────────────────────────────────

18  TO:  JPMORGAN CHASE BANK, NATIONAL ASSOCIATION (**"Chase"**)
          7301 Baymeadows Way
19        Jacksonville, FL 32256

20  TO:  QUALITY LOAN SERVICE CORP OF WASHINGTON (**QLSCW**)
          108 First Avenue South, Suite #450, Seattle, WA 98104

21

22
    A lawsuit has been started against you in the above-entitled court by John R. Wilson and Jacqueline
23
    M. Wilson, Plaintiffs. Plaintiffs claims are stated in the written Complaint, a copy of which is served
24
    upon you with this Summons.
25
            In order to defend against this lawsuit, you must respond to the Complaint by stating your
26
    defense in writing, and serve a copy upon the undersigned ProSe attorney for the Plaintiff (John R.

SUMMONS - 1
John R. and Jacqueline M. Wilson v JPMorgan Chase Bank, N.A.,
and Quality Loan Service Corporation of Washington

Wilson) within 20 days after the service of this Summons, excluding the day of service, if served outside the State of Washington, or a default judgment may be entered against you without notice. A default judgment is one where Plaintiff is entitled to what s/he asks for because you have not responded. If you serve a notice of appearance on the undersigned person, you are entitled to notice before a default judgment may be entered.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

This Summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

DATED this 28th day of April 2023.


SIGNED

John R. Wilson, ProSe for Plaintiffs
19318 99th Ave SE
Snohomish, WA 98296
T: 206.854.6851
E: john.wilson.udi@gmail.com

SUMMONS - 2
John R. and Jacqueline M. Wilson v JPMorgan Chase Bank, N.A.,
and Quality Loan Service Corporation of Washington

John Wilson, ProSe, T: 206.854.6851, E: john.wilson.udi@gmail.com
19318 99th Ave SE, Snohomish, WA 98296



**FILED**

APR 28 2023

HEIDI PERCY
COUNTY CLERK
SNOHOMISH CO. WASH.

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## FOR THE COUNTY OF SNOHOMISH

JOHN and JACQUELINE WILSON,
    a married couple
                        Plaintiffs,

vs.

JPMORGAN CHASE, N.A., and
QUALITY LOAN SERVICE CORP OF
WASHINGTON
                        Defendants

Case No. 23 2 03142 31

**COMPLAINT FOR DECLARATORY
JUDGMENT AND OTHER RELIEF
UNDER THE DECLARATORY
JUDGMENT ACT, RCW 7.24, AND THE
CONSUMER PROTECTION ACT, RCW
19.86, AND THE WASHINGTON AND
UNITED STATES CONSTITUTIONS**

Plaintiffs, John and Jacqueline Wilson, husband and wife, bring this action against

Defendants J. P. Morgan Chase Bank, NA ("Chase"), for violations of the Uniform Declaratory

Judgments Act (UDJA), RCW 7.24, the Consumer Protection Act, 19.86, Article 1, Section 23

of the Washington Constitution, and Article 1, Section 10, Clause 1 of the United States

Constitution.

Plaintiffs allege the following on information and belief.

## I.   INTRODUCTION

1.1     Plaintiffs refinanced their Snohomish County home, located at 19318 99th Ave. SE,

Snohomish, WA 98296, on April 22, 2005.

1.2     To close the loan, Plaintiffs were required by the lender, Washington Mutual Bank

("WaMu") to execute a promissory note ("Note") and deed of trust ("DOT"). The Note and

DOT are dated April 22, 2005.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

1

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

1.3    In late 2010, during the most significant worldwide economic crisis since the Great Depression, Plaintiffs began to encounter severe economic and medical setbacks.

1.4    On January 1, 2011, Plaintiffs failed to make the monthly payment required by the Note.

1.5    On February 28, 2011, JP Morgan Chase Bank, NA ("Chase"), Plaintiffs' lender, mailed Plaintiffs an Acceleration Warning (Notice of Intent to Foreclose) Notice ("Notice"). The Notice indicated Plaintiffs were in default because they had failed to pay the Note according to its terms. It warned that if Plaintiffs failed to clear the default by April 1, 2011, Chase **_would accelerate the maturity of the loan_**, **_declare all sums secured by the DOT immediately due and payable_**, and commence foreclosure proceedings, **_all without further notice to Plaintiffs._**

1.6    Plaintiffs did not cure the default by April 1, 2011, and Chase never notified Plaintiffs that it had decided not to accelerate the maturity of the loan. Therefore, on April 2, 2011, the loan matured and Chase's right to foreclose accrued.

1.7    After Chase's right to foreclose accrued, Chase had six years, until April 1, 2017, to recover on the debt obligation. RCW 4.16.040(1). It failed to recover by April 1, 2017. Therefore, the debt is time-barred. RCW 4.16.005.

1.8    Additionally, in Washington, the six-year statute of limitations begins to run on each installment of an installment promissory note on the day after the installment is due, if the note maker fails to pay the installment on its due date.

1.9    Plaintiffs have not made a payment on the Note since January 1, 2011. The statute of limitations ran on that installment on January 1, 2017. It has run on each monthly installment that was due after January 1, 2011, exactly one month after the previous month's installment.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

2

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

For example, the statute ran on the installment that was due on February 1, 2011, on February 1, 2017, etc.

1.10    The statute of limitations has run on all missed installments from January 1, 2011, through May 1, 2017—a total of 76 missed payments.

1.11    Chase includes all those time-barred payments—totaling more than $274,000—in its calculation of how much money Plaintiffs must pay to prevent the May 5, 2023, trustee's sale from taking place, without informing Plaintiffs that the time-barred payments are not lawfully collectible. As a result, the May 5, 2023, foreclosure sale, if it occurs, will violate the Deeds of Trust Act. Accordingly, the May 5, 2023, sale should be enjoined.

1.12    Under RCW Chapter 7.24, Plaintiffs seek to have the Court declare that Chase may not proceed with a foreclosure of Plaintiffs' Property because the statute of limitations on the collection of Plaintiffs' loan ran its course on April 2, 2017. RCW 7.24.010.

1.13    Failing that, Plaintiffs request that the Court order that the current non-judicial foreclosure, which will result in Plaintiffs' Property being sold on May 5, 2023, be discontinued, because the Notice of Trustee's Sale and Notice of Foreclosure attached thereto include nearly $275,000 in time-barred payments in their arrearage amount sections.

1.14    Additionally, the sale is being conducted pursuant to the Washington Deeds of Trust Act ("DTA").

1.15    Because the DTA authorizes a noteholder that does not own the note it holds, and not the note owner, to conduct a non-judicial foreclosure, the DTA violates Article 1, Section 23 of the Washington Constitution and Article 1, Section 10, Clause 1 of the U. S. Constitution and therefore is void.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

3

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

1.16 Chase should be permanently enjoined from conducting a foreclosure sale pursuant to a void statute.

## II   PARTIES

2.1 Plaintiffs, John and Jacqueline Wilson, are residents of Snohomish County, Washington. They plead the following of their own knowledge, and state that the allegations are true; except as to those allegations stated on information and belief. And as to each of those matters stated on information and belief, they believe them to be true.

2.2 Plaintiffs are lifelong Washington residents and own the property located at 19318 99th Avenue Southeast, Snohomish, Washington 98296 ("Property"). The Property is the subject of this litigation.

2.3 Defendant JP Morgan Chase Bank, NA ("Chase") is a national bank. It conducts business in Washington by making, purchasing, and servicing loans that are secured by real property located in Washington. Chase represents that it owns Plaintiffs' loan.

2.4 Defendant Quality Loan Services of Washington, Inc. ("Quality") is a professional corporation that is incorporated in the State of Washington. An appointment of successor trustee recorded in the records of King County, Washington purports to appoint Quality the successor trustee for the purpose of conducting the foreclosure sale of the Property. However, on the date Chase attempted to appoint QLS the successor trustee, a QLS officer did not reside in Washington. QLS has never been lawfully appointed the successor trustee.

2.5 The true names and capacities of Does 1 through 8, whether individual, corporate, partnership, associate or otherwise, are presently unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names. Plaintiffs allege, based on information and belief, that each Defendant is responsible in some manner for the events described herein and is liable to

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

4

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

1    Plaintiffs for the damages Plaintiffs have incurred. Plaintiffs will amend this Complaint to show

2    the true names and capacities of the Doe Defendants when the same have been ascertained.

3        2.6    At all times mentioned herein, each was the agent, servant, representative and/or

4    employee of each of the other Defendants and was acting within the course and scope of such

5    agency or employment. The exact terms and conditions of such agency, representation, or

6    employment relationships are not presently known by Plaintiffs, but when those terms and

7    conditions are ascertained, leave of court will be sought to insert the appropriate allegations.

8    
9    ### III    JURISDICTION AND VENUE

10   
11       3.1    The Court has subject matter jurisdiction over this Complaint under the provisions

12   of the Uniform Declaratory Judgments Act, RCW 7.24, the CPA, RCW 19.86, and the

13   Washington and United States Constitutions.

14       3.2    The Court has jurisdiction to grant restraining orders and injunctions under RCW

15   7.40.

16       3.3    This Court has personal jurisdiction over Chase because Chase does substantial

17   
18   business in Snohomish County through its numerous locations in the County; and it commenced

19   the non-judicial foreclosure proceeding that is the subject of this Complaint in Snohomish

20   County.

21       3.4    This Court has personal jurisdiction over Plaintiffs because Plaintiffs commenced

22   this lawsuit in Snohomish Superior Court, and Plaintiffs are residents of Snohomish County,

23   Washington.

24   
25   
26   
27   
28   COMPLAINT FOR DECLARATORY JUDGMENT, CPA
     AND U.S. AND STATE CONSTITUTIONS

5

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

3.5     Venue is proper because the events giving rise to this action occurred in Snohomish County, Washington, and because Chase has done and continues to do business in Snohomish County. RCW 4.12.020(3); RCW 4.12.025(1).

## IV    FACTS

**A.**        **The Statute of Limitations Has Expired on the Debt That the May 5, 2023, Non-Judicial Foreclosure Seeks to Enforce.**

4.1     Plaintiffs refinanced the Property through Washington Mutual Bank, NA ("WaMu"). To close the loan, WaMu required Plaintiffs to execute two documents: a promissory note in the amount of $567,000 ("Note"); and a deed of trust ("DOT").

4.2     Plaintiffs executed the unaltered documents on April 22, 2005, and the loan closed on that date. Copies of the Note and DOT are attached to Plaintiff John Wilson's Declaration as Exhibits 1 and 2 and are incorporated herein by this reference.

4.3     On September 25, 2008, the Federal Deposit Insurance Corp. ("FDIC") took control of WaMu and placed it in receivership after account holders withdrew $16.7 billion in deposits over a nine-day stretch in early September. On that same date, Chase purchased WaMu's banking assets from the FDIC for $1.9 billion. Plaintiffs' loan allegedly was among the purchased assets.

4.4     In 2010, at the tail end of the once-in-a-lifetime housing crisis, Plaintiffs encountered severe medical, economic, and family difficulties. These encounters devastated Plaintiffs financially and destroyed their previously high credit ratings.

4.5     On January 1, 2011, Plaintiffs failed to make the monthly payment required by the Note. Under Washington law, the statute of limitations respecting this missed payment commenced running on January 2, 2011.

COMPLAINT FOR DECLARATORY JUDGMENT,CPA
AND U.S.AND STATE CONSTITUTIONS

6

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

4.6     On February 28, 2011, Chase mailed an Acceleration Warning (Notice of Intent to Foreclose) ("Notice") Notice to Plaintiffs. A copy of the Notice is attached to Plaintiff John Wilson's Declaration as Exhibit 3 and is incorporated herein by this reference.

4.7     The Notice indicated Plaintiffs were in default because they had failed to pay the January installment of the Note; revealed the  amount of the default; explained that Plaintiffs had until 32 days after the date on the Notice, April 1, 2011, to cure the default; and informed Plaintiffs that if we did not cure the default by April 1, 2011, Chase ***would*** accelerate the maturity of the loan, declare all sums secured by the DOT immediately due and payable, and commence foreclosure proceedings, ***all without further notice to Plaintiffs.***

4.8     Chase did not claim that it may, might, or could accelerate the maturity of the loan; it commanded that if the default were not cleared, it ***would*** accelerate the maturity of the loan.

4.9     This was no idol threat. Under the terms of Plaintiffs' deed of trust, if, after a default, the lender provides a notice to the borrower that contains precisely the information contained in the contractual Notice, and the borrower fails to cure the default on or before the date specified in the notice, the "Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law." Exh. 2 at 15.

4.10    Plaintiffs never cured the default, and Chase never withdraw its command—a command it had a contractual right to issue—that it would accelerate the maturity of the Loan without further notice to Plaintiffs, if Plaintiffs failed to cure the default by April 1, 2011.

4.11    Thus, on April 2, 2011, consistent with the terms of the DOT, and in ***accordance with Chase's representations in the February 28, 2011 Notice***, Chase accelerated the maturity of the loan; the right to foreclose ***accrued***; and the statute of limitations began to run on Chase's

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S.AND STATE CONSTITUTIONS

7

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

right to enforce Plaintiffs' obligation to repay the loan. Kilbourne v. City of Everett, No. 76461-6-I, at *9 (2018) ("In general, the statute of limitation begins to run when a cause of action *accrues*."); Mason v. Mason, 497 P.3d 431, 445 (2021) ("The statute of limitations for a tort action is three years. RCW 4.16.080(2). It begins to run at the point at which a plaintiff's cause of action *accrues*."); Thomas v. Redmond Police Dep't, No. 81718-3-I, at *5-6 (2021) ("The statute of limitations period begins to run when the plaintiff's cause of action *accrues*.").

4.12   In Washington, an action upon a contract in writing must be commenced within six years after *the right of action accrues*. RCW 4.16.040(1). Whether the lender chooses to act on its right is not part of the equation; the six-year statute of limitations period begins to run on the day *the cause of action accrues*. RCW 4.16.005.

4.13   The intransitive verb "accrues" is not defined in RCW Chapter 4.16. Therefore, the term has its ordinary meaning in a legal context, which may be determined by reference to a standard dictionary. Black's Law Dictionary (5th ed. 1979) ("Black's") explains that "(a) *cause of action 'accrues'* when a suit may be taken thereon." Black's at 19.

4.14   According to Chase's representations to Plaintiffs, highly deceptive representations if not true, and Plaintiffs' deed of trust, Chase could have commenced a suit on Plaintiffs' entire loan any time on or after April 2, 2011.

4.15   Therefore, the six-year statute began to run on the entire debt on April 2, 2011, and expired on April 2, 2017.

4.16   Hence, the Notice of Trustee's Sale mailed to Plaintiffs on or about December 5, 2022, commenced a non-judicial foreclosure proceeding nearly six-years after the statute of limitations for the proceeding had run its course.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S.AND STATE CONSTITUTIONS

8

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

4.17   Alternatively, if the Court finds that the lender's right to enforce repayment of the entire debt obligation has not accrued, then the statute of limitations commenced running separately on each installment payment Plaintiffs failed to timely make. Therefore, the statute of limitations has run on all missed installments from January 1, 2011, through May 1, 2017—a total of 76 missed payments.

4.18   At an average monthly payment amount of $3,581.24 ($533,602.06/149 (the number of months between January 1, 2011, and May 1, 2023), 77 missed payments total $275,755.82.

4.19   Neither the Notice of Trustee's Sale nor the Notice of Foreclosure, which accompanies the Notice of Trustee's Sale, distinguishes between the viable debt and the unenforceable, time-barred debt. The clear intention of the notices is to force Plaintiffs to believe that they must pay the entire amount of the arrearages to retain control of the Property.

4.20   Omitting the material information that $275,755.82 of the arrearages was unenforceable, time-barred debt created a highly misleading impression of Chase's leverage and Plaintiffs' risk, thereby satisfying the first two elements—(1) deception (2) in commerce—of a CPA claim. Cf. *Kaiser v. Cascade Capital, LLC*, 989 F.3d 1127, 1134 (9th Cir. 2021) ("Whether a debt is legally enforceable is a central fact about the character and legal status of that debt.").

4.21   If this Court determines the statute of limitations has not run on the entire debt, a decision that Plaintiffs believe would be legally insupportable given Chase's DOT contract rights and the representations Quality, acting on Chase's behalf, makes in the Notice and the Notices of Trustee's Sale and Foreclosure, the sale should still be temporarily restrained and ultimately permanently enjoined.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

9

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

4.22   Under Washington law, Chase may not enforce the time-barred past-due installments. *Saody Eng v. Specialized Loan Servicing*, 500 P.3d 171 (2021). And enforcing time-barred, past-due installments is precisely what the current foreclosure proceeding is attempting to do.

4.23   The statute of limitations has run on approximately $275,755.86 of the $533,602.06 the Notice of Trustee's Sale required Plaintiffs to pay by April 10, 2023, to avoid the Property being sold at a trustee's sale on April 21, 2023.

4.24   Knowing that more than one-half of the arrearages listed in the Notice of Trustee's Sale and Notice of Foreclosure attached thereto were unenforceable, time-barred debt, Defendants, Chase and Quality Loan Services of Washington ("Quality"), knowingly and intentionally failed to reveal to Plaintiffs that more than one-half the claimed arrearages were unenforceable, time-barred debt.

4.25   By requiring Plaintiffs to pay substantial amounts of time-barred debt to rescue their home from foreclosure without disclosing that the debt was legally unenforceable, Chase acted unfairly and/or deceptively under the CPA. *RCW 19.86.020.*

4.26   Plaintiffs have incurred significant expenses combatting this unlawful foreclosure and the previous nonjudicial foreclosure attempts that have suffered from the same legal insufficiencies as this attempt.

4.27   The activities of Defendants described above satisfy the "deceptive act" and "in commerce" elements of a CPA claim; have deceived Plaintiffs; and have the capacity to deceive a substantial portion of the public.

4.28   The capacity of Defendants acts to deceive the public satisfies the "public interest" element of a CPA claim.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

10

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

4.29   Unless the sale is halted, Plaintiffs' Property will be sold at public auction on May 5th because, at least in significant part, Plaintiffs failed to pay $275,755.24 of unenforceable, time-barred debt.  In consequence, the fourth and fifth elements of a CPA claim—injury to property and causation—have been met.

4.30   Defendant Chase is the largest bank in the United States, and, by capitalization, the largest bank in the world. It owns 10s, if not 100s, of thousands of residential home loans. Additional proof that the activities Plaintiffs describe above are happening in commerce and affect the public interest.

4.31   On information and belief, Chase engages in these same illicit practices as a routine part of its foreclosure activities.

4.32   If the Property is sold at a trustee's sale on May 5th, Plaintiffs' property interests will be irreparably and irrevocably injured, and Defendants' unlawful foreclosure sale will be the sole cause of those injuries.

4.33   Plaintiffs request that the Court order that the present non-judicial foreclosure proceeding must be discontinued because the notices of trustee's sale and foreclosure include time-barred amounts in the amount that Plaintiffs were required to pay to prevent the foreclosure from taking place.

**B.     The Deeds of Trust Act Is Void Because It Violates Article 1, § 23 of the Washington Constitution and Article 1, § 10, Clause 1 of the U. S. Constitution.**

4.34   The decision in *Brown v. Dept. of Commerce*, 184 Wn. 2d 509, 359 P.3d 771 (2015) grants the holder of a secured promissory note that does not own the note it holds the right to foreclose.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

11

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

4.35    The decision prompted the Washington legislature to amend the Washington Deeds of Trust Act ("DTA") in June 2018.

4.36    For purposes of this litigation, the most important June 7, 2018, amendments involved who may foreclose the deed of trust.

4.39    Prior to June 7, 2018, RCW 61.24.030(7)(a) required the trustee to have proof that the beneficiary was the **_owner_** of the promissory note or other obligation secured by the deed of trust before the trustee could record, transmit, or serve the notice of trustee's sale.

4.40  In Washington, a notice of trustee's sale must be recorded, transmitted, and served before a trustee's sale may be lawfully conducted. *RCW 61.24.040(1).*

4.41    On June 7, 2018, the legislature deleted the word "owner" from RCW 61.24.030(7)(a) and 61.24.040(3) and inserted the word "holder" in its place in each statutory provision.

4.42    As a result of these changes, the current version of the DTA violates Article 1, §10 of the United States Constitution, and Article 1, §23 of the Washington Constitution, because the amendments obliterate the deed of trust contract ("DOT").

## V    DECLARATORY JUDGMENT

5.1    Plaintiffs re-allege all preceding paragraph and incorporate them as if set forth fully herein.

### A. The Statute of Limitations Ran on the Entire Debt on April 2, 2017.

5.2    Section 22 on page 15 of Plaintiffs' DOT gives Chase the right to demand payment of the debt in full by satisfying the conditions denominated in the Section:

> **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument. . .. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S.AND STATE CONSTITUTIONS

12

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice ***may*** result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.

The Notice (Exh. 3) satisfied each of the above-recited contractual conditions for Chase to be legally entitled to accelerate the maturity of the loan.

5.3     Thus, when Chase declared in the Notice (Exh. 3) that it ***would—not may, might, or could***—accelerate the maturity of the loan and declare all sums secured by the DOT immediately due and payable, ***without further notice to Plaintiffs***, if Plaintiffs failed to pay the arrearages within 32 days from the date on the Notice, Chase was within its contractual rights.

5.4     Hence, following issuance of the Notice, only the occurrence of either of two events could prevent acceleration of the debt: (1) Plaintiffs' payment of the arrearages on or before the 32nd day following the date on the Notice; or (2) Chase's retraction of its proclamation that the maturity of the loan would automatically be accelerated on the 33rd day following the date on the Notice, unless Plaintiffs paid the arrearages on or before the 32nd date following the date on the Notice.

5.5     Neither of those events occurred. Accordingly, the loan maturity accelerated on April 2, 2011.

5.6     It must be remembered that under RCW 4.16.005, it is the ***acquisition of the right to accelerate the debt*** (i.e., it is when the right to accelerate the debt ***accrues***), not when the right to accelerate the debt is utilized, that commences the running of the statute of limitations.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S.AND STATE CONSTITUTIONS

13

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

And under both the terms of the Notice and the terms of the DOT itself, the right to accelerate the maturity of the loan accrued on April 2, 2011. *Exh. 2* at 15; *Exh.* 3 at 2.

5.7     Moreover, RCW 61.24.090(1)'s 11 day-prior-to-sale restriction on acceleration of the debt is unavailable to Defendants because each notice of trustee's sale issued by Defendants over the years was issued illegally. *See RCW 61.24.030*.

5.8     On April 2, 2011, the 33rd day following the date on the Notice, because Plaintiffs had not paid the arrearages and Chase had not retracted its ultimatum that the maturity of the loan would accelerate on the 33rd day, the maturity of the loan accelerated, and all sums secured by the DOT became immediately due and payable.

5.9     Therefore, the limitations period expired on April 2, 2017.

5.10    The current non-judicial foreclosure proceeding was initiated more than 6 years after the statute of limitations on the entire debt expired.

5.11    Consequentially, Plaintiffs are entitled to a temporary restraining order preventing the sale from occurring until Plaintiffs' motion for a declaratory judgment can be heard, or until the passage of fourteen days from the date on which the temporary restraining order is issued, whichever occurs first.

**B.      The May 5, 2023, Proposed Trustee's Sale Should Be Permanently Enjoined.**

5.12    Defendants may not enforce time-barred past-due installment payments without informing Plaintiffs that the payments are time-barred and legally unenforceable. The routine attempt to do so is an unfair and deceptive practice. The CPA prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce. *RCW 19.86.020*.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

14

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

5.13    A multi-national bank's attempt to take borrowers' homes to collect time-barred debts without informing the borrowers that the debts are time-barred is an unfair and deceptive practice in the conduct of trade or commerce.

5.14    Defendants cannot be allowed to take Plaintiffs' home by engaging in acts that the CPA prohibits. *Id.*

5.15    The statute of limitations has run on approximately $275,755.24 of the $533,602.06 that the Notice of Trustee's Sale and accompanying Notice of Foreclosure required Plaintiffs to pay by April 10, 2023, to avoid the Property being sold at a trustee's sale on April 21, 2023.[1] $275,755 of the arrearages was unenforceable, time-barred debt. Therefore, this sale cannot take place.

5.16    Plaintiffs are entitled to a declaratory judgment that a non-judicial foreclosure proceeding in which the lender attempts to recover unenforceable, time-barred debt without informing the homeowner that the debt is unenforceable may not be maintained in Washington.

**C.    Plaintiffs are entitled to a Declaratory judgment that the Washington Deeds of Trust Act Unconstitutionally Impairs and Invalidates the Deed of Trust.**

5.17    On April 22, 2005, Plaintiffs closed a loan refinance transaction with WaMu.

5.18    During the Loan negotiation process, Plaintiffs offered in writing a specific method for repaying the Loan: on the first day of each month for the next 40 years, without fail, Plaintiffs would pay, each month, the amount of money established by the terms of the Note.

5.19    Had WaMu refused to accept the Note or some other repayment arrangement for Plaintiffs' obligation to repay the Loan in full, Plaintiffs would have been obligated to repay the Loan in full on demand. *RCW 62A.3-108(a)(ii).*[2] WaMu's acceptance of the Note as the primary

---

[1] The sale has been continued to May 5, 2023.
[2] "(a) A promise or order is "payable on demand" if it . . . (ii) does not state any time of payment."
COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

15

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

method of repaying the loan *__suspended__*[3] the Obligation, i.e, WaMu's acceptance of Plaintiffs'
offer to repay the Loan over time *__suspended__* what otherwise would have been Plaintiffs'
obligation to repay the loan in full on demand. *RCW 62A.3-310(b)*[4]; and *RCW 62A.3-108(a)(ii).*

    5.20   WaMu's acceptance of the Note did not **terminate** Plaintiffs' obligation to repay the
Loan in full on demand. *See RCW 62A.3-310(b).* And it did not **merge** Plaintiffs' obligation *__to
WaMu__* to repay the Loan in full on demand into Plaintiffs' obligation *__to the noteholder__* to pay
the Note according to its terms *__to the noteholder__*. *Id.* What the acceptance did is: (1) tether
Plaintiffs' obligation to WaMu to repay the Loan in full on demand to Plaintiffs' obligation to the
noteholder to pay the Note according to its terms to the Noteholder; and (2) *__suspend__* WaMu's
right to demand that Plaintiffs repay the Loan in full on demand until the note is dishonored or
paid in full. *Id.*

    5.21   In other words, in every deed of trust-secured loan transaction, the
homeowner/borrower incurs two sets of obligations, not one: (1) the obligation *__to the lender__* to
repay the loan in full; and (2) the obligation *__to the noteholder__* to pay the note according to its
terms *__to the noteholder__*.

5.22   The Brown Court determined that the borrower in a deed of trust-secured loan transaction
has a single obligation—the obligation *__to the noteholder__* to pay the note according to its terms *__to
the__* noteholder:

> When the borrower pays the PETE—and *__only__* when the borrower pays the
> PETE—the borrower's *__obligation__* is discharged. See RCW 62A.3–602(a) ("[A]n
> instrument is paid to the extent payment is made ... to a person entitled to enforce

---

[3] "'7. To cause to cease for a time from operation or effect, as a law, rule, privilege, or the like: *to suspend
parking lot rules; to suspend ferry service. . .*'; 11. 'To come to a stop, usually temporarily; cease from operation
for a time.'" *Webster's Encyclopedic Unabridged Dictionary of the English Language* (1996) ("*Webster's*") at
1433.
    "To interrupt; to cause to cease for a time; to postpone; to stay, delay, or hinder; to discontinue
temporarily, but with an expectation or purpose of resumption." *Black's Law Dictionary* (5th ed. 1979) at 1297.
[4] "Unless otherwise agreed . . ., if a note . . . is taken for an obligation, the obligation is suspended to the
same extent the obligation would be discharged." *Webster's* at 734.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S.AND STATE CONSTITUTIONS
      16            John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

the instrument[, a PETE]. To the extent of the payment, the ***obligation*** of the party obliged to pay the instrument is discharged...." (emphasis added)). After discharging its ***obligations to the PETE***, the borrower cannot thereafter be held liable on the note by another party, such as the note owner. *Id.*

In sum, the borrower owes and discharges his or her ***obligation*** to the PETE. The PETE enforces and modifies the note. This relationship remains the case "even though the [PETE] is not the owner of the instrument." RCW 62A.3–301. The PETE's possession of the note provides the borrower "with a relatively simple way of determining to whom his or her obligation is owed and, thus, whom to pay in order to be discharged." UCC Report on Mortgage Notes, *supra*, at 8. *Brown v. Wash. State Dep't of Commerce*, 184 Wash. 2d 509, 527 (Wash. 2015).

5.23   The *Brown* Court's determination was incorrect. *RCW 62A.3-310; RCW 62A.3-108(a)(ii).* To determine how many obligations a borrower has, and to whom those obligations are owed, RCW 62A.3-310 and 3-108(a)(ii) must be consulted. The *Brown* Court never consulted either statutory provision.

5.24   It is true that the owner of the note may not hold the borrower personally liable on the note after the borrower has discharged its obligations to the PETE on the note (*RCW 62A.3-602(a)*). But if the discharge of the borrower's personal liability on the note is the result of a Chapter 7 Liquidation, the lender's right to foreclose on the mortgage, the security for repayment of the loan, passes through bankruptcy. *Johnson v. Home State Bank*, 501 U. S. 78, 82-83 (1991); 11 U.S.C. § 522(c)(2).

5.25   This outcome proves that the borrower in a deed of trust-secured loan transaction incurs two sets of obligations, not one: (1) the borrower's personal obligation ***to the noteholder*** to pay the note to the noteholder—this obligation does not survive a Chapter 7 Liquidation; and (2) the borrower's property's obligation ***to the lender*** to repay the loan in the event the borrower dishonors his or her personal obligation ***to the noteholder*** to pay the note in full—this obligation survives a Chapter 7 Liquidation.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S.AND STATE CONSTITUTIONS

17

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

5.26    If the borrower's personal obligation ***to the noteholder*** to pay the note in full was the borrower's only obligation, a Chapter 7 liquidation would leave the lender in a deed of trust secured loan transaction without a remedy.

5.27    There are two obligations and, therefore, two ways of obtaining repayment of the loan—enforcement of the note or foreclosure. *Owen v. Owen*, 500 U.S. 305, 308-309 (1991); *Farrey v. Sanderfoot*, 500 U.S. 291, 297 (1991).

5.28    The second way of obtaining repayment of the loan, foreclosure, is dormant until the note is dishonored or fully paid. *RCW 62A.3-310(b)(2).*

5.29    If the note is dishonored, and the lender is the PETE, the lender has a choice: it may enforce either (1) the borrower's obligation ***to the noteholder*** to pay the note in full ***to the noteholder***, an *in personam*[5] borrower obligation (*Washington State Bank v. Medalia Healthcare*, 96 Wn. App. 547, 555 (1999) ("Generally, actions for monetary recovery are in personam and are transitory in nature.")), or (2) the borrower's obligation ***to the lender*** to repay the loan by foreclosing under the deed of trust—an *in rem*[6] borrower obligation. *RCW 62A.3-310(3).*[7]

5.30    However, if PETE status is held by a servicer to whom the lender has delivered the blank-endorsed promissory note, the lender may not enforce the right to repayment of the loan by foreclosing under the deed of trust, because the right to repayment of the loan is represented by

---

[5] "Against the person. Action seeking judgment against a person involving his personal rights and based on jurisdiction of his person, as distinguished from a judgment against property (i.e. in rem)." *Black's* at 711.

[6] "A technical term used to designate proceedings or actions instituted *against the thing,* in contradistinction to personal actions, which are said to be *in personam*. An "action in rem" is a proceeding that takes no cognizance of owner but determines right in specific property against all of the world, equally binding on everyone. (cite omitted). It is true that, in a strict sense, a proceeding *in rem* is one taken directly against property, without reference to the title of individual claimants; but in a larger and more general sense, the terms are applied to actions between parties, where the direct object is to reach and dispose of property owned by them, or of some interest therein."

[7] "(3) Except as provided in subsection (b)(4), if the check or note is dishonored and the obligee of the obligation for which the instrument a taken is the person entitled to enforce the instrument, the obligee may enforce either the instrument or the obligation.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S.AND STATE CONSTITUTIONS

18

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

the note which is enforceable by the PETE, not the obligee of the obligation, i.e., not the lender. *Official Comment 3 to UCC Section 3-310*. And the PETE may not enforce the lender's right to repayment of the loan by foreclosing under the deed of trust, because the PETE is not a party to the deed of trust contract.

Official Comment 3 to UCC Section 3-310 clearly explains the point:

> 3. Subsection (b) concerns cases in which an uncertified check or *a note is taken for an obligation*. The typical case is that in which a buyer pays for goods or services by giving the seller the buyer's personal check, *or in which the buyer signs a note for the purchase price*. . . . Subsection (b) preserves the rule under former section 3-802(1)(b) that the buyer's obligation to pay the price is suspended, but subsection (b) spells out the effect more precisely. *If the check or note is dishonored, the seller may sue on either the dishonored instrument or the contract of sale if the seller has possession of the instrument and is the person entitled to enforce it. If the right to enforce the instrument is held by somebody other than the seller, the seller can't enforce the right to payment of the price under the sales contract because that right is represented by the instrument which is enforceable by somebody else.* Thus, if the seller sold the note or the check to a holder and has not reacquired it after dishonor, ***the only right that survives is the right to enforce the instrument***.
> *Underlining, italics, and **bolding** added.*

5.31   In other words, the Washington Supreme Court's incorrect holding in *Brown* notwithstanding, if the lender, while retaining ownership of the note, blank-endorses the note and transfers it to a servicer after the note has been dishonored, the only right that survives the transfer is the right to enforce the note. Again, the PETE may not enforce the lender's right to repayment of the loan by foreclosing under the deed of trust, because the PETE is not a party to the deed of trust contract. And the lender may not enforce its right to repayment of the loan by foreclosing under the deed of trust because the right to repayment of the loan is represented by the note which is enforceable by the servicer, not the lender. *Id.*

5.32   This reasoning is supported by RCW 62A.3-310(b)(2)-(3), Official Comment 3 to UCC Section 3-310, RCW 61.24.030(3), RCW 61.24.080(2), the Transfer of Rights in the

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

19

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

Property Section of the DOT, Section 22 of the Deed of Trust, RCW 62A.9A-109(d)(5), and RCW 62A.9A-203(a), (b), and (g) (the codification of the common law Security Follows the Note Doctrine).

5.33   The idea that M&T was the beneficiary in *Brown* is absurd.

**1. The Holding in *Brown v. Dept. of Commerce* Is Legally Indefensible.**

5.34   Plaintiffs' DOT contract states the terms upon which Plaintiffs have provided security to the Lender—whether the original Lender or a subsequent Lender—since April 22, 2005, the date on which the Loan closed. It is impossible to determine what the deed of trust contract secures, to whom it provides security, or how it provides security to whomever it provides security without analyzing the contract's provisions.

5.35   In *Brown,* without looking at or analyzing any of the provisions in the DOT contract, the Washington Supreme Court attempted to do the impossible: determine which entity, M&T Bank ("M&T") or the Federal Home Loan Mortgage Corporation ("Freddie Mac"), was the beneficiary of Doris Brown's deed of trust contract:

> The parties agree the note is secured by a publicly recorded deed of trust, **but the deed _is not_ in this court's record. The deed's _absence_ from the record** does not affect this case because RCW 62A.9A-203(g) " 'codifies the common-law rule that a transfer of an obligation secured by a security interest or other lien on personal or real property also transfers the security interest or lien,' " UCC Report on Mortgage Notes, supra, at 12 n. 44 (quoting RCWA 62A.9A–203 U.C.C. cmt. 9); see also RCW 62A.9A-203(g) ("The attachment of a security interest [i.e., the "interest of a ... buyer of ... a promissory note," RCW 62A.1–201(b)(35),] in a right to payment ... secured by a security interest ... on personal or real property is also attachment of a security interest in the security interest, mortgage, or other lien."). This statute "explicitly provides that ... the assignment of the interest of the seller ... automatically transfers a corresponding interest in the mortgage to the assignee." UCC Report on Mortgage Notes, supra, at 12. The parties present no arguments relating to the deed of trust as distinct from the note. *Brown,* 184 Wn. 2d at 530, n. 9.

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

5.36   Consequently, the Court's analysis was devoid of a sound legal foundation and, predictably, led to a provably incorrect holding—that M&T Bank, by virtue of holding a promissory note it did not own, was the beneficiary of Ms. Brown's deed of trust contract. With all due respect to the Washington Supreme Court, which Plaintiffs hold in the highest regard, that holding simply is incorrect.

5.37   A deed of trust agreement is a three-party agreement—trustor (borrower), trustee, and beneficiary/secured party (lender). *Brown,* 184 Wn. 2d at 515; *Bain v. Metro. Mortg. Grp., Inc.,* 175 Wash. 2d 83, 93 (2012). The lender is always the secured party/beneficiary, and the servicer is never a party to the agreement.

5.38   The Lender is the secured party/beneficiary in Plaintiffs' deed of trust. *Exh. 2* Definition Section, (1)(C) at 1; *Exh. 2,* Transfer of Rights in the Property Section at 2.

5.39   A PETE that does not own the note it holds can never be the secured party/beneficiary of a deed of trust, because it never holds the interests the deed of trust secures, and it never holds either of the two interests that collectively secure the interests the deed of trust secures.

**2.      The DTA Violates Article 1, Section 23 of the Washington Constitution and Article 1, Section 10, Clause 1 of the United States Constitution.**

5.40   Under Article 1, § 10, Clause 1 of the U.S. Constitution and Article 1, § 23 of the Washington Constitution any legislation that impairs the obligations of a contract is presumed to be unconstitutional. *Washington Fed'n of State Employees v. State,* 127 Wn.2d 544, 560, 901 P.2d 1028 (1995) (quoting *Ruano v. Spellman,* 81 Wn.2d 820, 825, 505 P.2d 447 (1973). In Washington, freedom of contract is one of our most highly prized liberties. *Chi. Title Ins. Co. v. Wash. State Office of the Ins. Comm'r,* 178 Wash. 2d 120, 145 (2013).

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

21

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

5.40    Washington courts read the two Articles co-extensively (*Tyrpak v. Daniels*, 124 Wn.2d 146, 151, 874 P.2d 1374 (1994)) and govern them by the same standard. *Haberman v. WPPSS*, 109 Wn.2d 107, 144-45, 744 P.2d 1032, 750 P.2d 254 (1987).

5.41    Impairments of contract are evaluated under a 3-part test. The first question is whether the impairment is substantial. If it is, then two conditions must be met: the State must have a significant and legitimate public purpose behind its legislation and the change in the rights of the parties must be reasonable in relation to the public purpose. *Energy Reserves Group, Inc. v. Kansas Power Light Co.*, 459 U.S. 400, 411-12, 74 L.Ed.2d 569, 103 S.Ct. 697 (1983); *United States Trust Co. v. New Jersey*, 431 U.S. 1, 22, 52 L.Ed.2d 92, 97 S.Ct. 1505 (1977).

5.42    If a statute alters the terms of a contract, or imposes new conditions, the contract is impaired. *Caritas Servs., Inc. v. Dep't of Soc. Health Servs.*, 123 Wn.2d 391, 404, 869 P.2d 28 (1994).

**a. The DTA Not Only Alters the Terms of the Contract, But Also Invalidates the Contract.**

5.43    After the Brown decision, in June 2018, the legislature amended the DTA to conform to the Brown decision.

5.44    Below, Plaintiffs prove that the amendments have not only impaired a uniform deed of trust agreement, but also have invalidated the agreement.

5.45    Under the terms of Plaintiffs' DOT, to be the beneficiary, a person must be: **(1)** a party to the Contract; **(2)** the secured party;  **(3)** the entity that loaned the borrower the money; **(4)** the person entitled to foreclosure proceeds; **(5)** the person for whose benefit the deed of trust irrevocably conveys the borrower's property to the trustee, in trust, with power of sale; **(6)** the

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S.AND STATE CONSTITUTIONS

22

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

owner of the right to the economic benefit of each payment the borrower makes to the noteholder; **(7)** the owner of the borrower's obligation to repay the loan by making each payment required by the note to the noteholder; and **(8)** the owner of the beneficial interest in the borrower's home.

5.46   The Deed of Trust Act ("DTA") eliminates each of these requirements, and thereby not only significantly impairs Plaintiffs' deed of trust contract, but also demolishes or lays waste to it.

5.47   RCW 61.24.005(2) reads as follows:   "(2) 'Beneficiary' means the holder of the instrument or document evidencing the obligations secured by the deed of trust, excluding persons holding the same as security for a different obligation." Pursuant to the plain language of this statutory provision, to be the beneficiary of the Contract, a person need not be: **(1)** a party to the Contract; **(2)** the secured party; **(3)** the lender; **(4)** the person entitled to foreclosure proceeds; **(5)** the person for whose benefit the deed of trust irrevocably conveys the borrower's property to the Trustee, in trust, with power of sale;   **(6)** the owner of the right to the economic benefit of each note payment the homeowner/borrower makes to the noteholder; **(7)** the owner of the borrower's obligation to repay the loan by making each payment required by the note to the noteholder; or **(8)** the owner of the beneficial interest in the homeowner's home. Under RCW 61.24.005(2), holder-of-the-note status is the only requirement a person must satisfy to be the beneficiary-of-the-deed of trust.

      **a.**    **M&T Bank Was Not a Party to the Deed of Trust in *Brown v. Dept. of Commerce.***

5.48   In *Brown*, M&T Bank ("M&T") was not a party to the Contract.  The Contract was unambiguously a three-party agreement—lender (Freddie Mac), borrower (Doris Brown), and trustee.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

### b.     M&T Was Not the Secured Party.

5.49   The named "secured party" was the lender, Freddie Mac. Darlene Brown's Contract did not bind or benefit M&T, because M&T never purchased Ms. Brown's loan. In Brown, M&T was not the secured party, Freddie Mac was.

### c.     M&T Was Not the Lender.

5.50   The Brown Court acknowledged that Freddie Mac was the Lender. *See Brown*, 184 Wn. 2d at 514, and 520.

In *Brown*, M&T was not the lender; Freddie Mac was. M&T was not the beneficiary of Darlene Brown's deed of trust; Freddie Mac was.

### d.     M&T Was Not Entitled to Foreclosure Proceeds.

5.51   A deed of trust, by conveying the homeowner/borrower's property to a trustee, in trust, with power of sale, for the benefit of the lender (beneficiary), secures to the lender (beneficiary) repayment of the loan. After a borrower defaults on the obligation to the lender to deliver the economic benefit of each payment the note requires the borrower to make to the noteholder, and the Section 22 conditions for making operative the power to sell the property have been met, the trustee is empowered and obligated to sell the property and pay the proceeds of the sale, i.e., the foreclosure proceeds, to the lender (beneficiary). *Exh.* 2, Section 22 at 15.

5.52   In *Brown*, the Supreme Court acknowledges that Freddie Mac, after transferring the blank-endorsed note to M&T, still would have been entitled to foreclosure proceeds if the property had been sold. *Brown*, 184 Wash. 2d at 524 ("The first set of rights is held by the "person entitled to enforce" the note, a legal term of art commonly referred to as "PETE" status. See RCW 62A.3–301 (definition). The second set of rights is ownership of the note. The owner has the right to the economic benefits of the note, such as monthly mortgage payments and ***foreclosure proceeds***.").

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

24

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

5.53   The *Brown* Court transparently did not understand that by acknowledging that the trustee would have been obligated to pay foreclosure proceeds to Freddie Mac if the property had been sold, the Court was simultaneously acknowledging that Freddie Mac, not M&T, was the beneficiary of the deed of trust. As a matter of law, this is true under the current version of the DTA. *RCW 61.24.080(2).*

5.54   As presently constituted, the DTA not only conflicts with various other Washington statutory provisions, but also conflicts with itself.

5.55   RCW 61.24.080(2) reads as follows: "The trustee shall apply the proceeds of the sale as follows: . . .. (2) To the obligation secured by the deed of trust[.]" The word "obligation" is defined as a duty binding one to perform. *Black's* at 796. "Duty" is an intangible concept. Therefore, it would be impossible for the trustee to pay the proceeds of the sale to the obligation. A statute cannot require one to do that which it is impossible to do. *Bates v. Cooley*, 187 Wn. 489, 497 (Wash. 1936); *State v. Twitchell*, 60 Wn. 2d 547, 550 (1962)

5.56   Thus, RCW 61.24.080(2) means the trustee must pay the proceeds of the sale, i.e., the foreclosure proceeds, ***to the person*** *that owns the obligation secured by the deed of trust*, i.e., to the secured party. In a deed of trust, the secured party and the beneficiary are always the same person. Compare *Exh. 2*, Transfer of Rights in the Property Section at 2, to *Id.*, Definition Section (1)(C) at 1. And the secured party of a deed of trust is always the lender. *Id.*, Transfer of Rights in the Property Section at 2.

5.57   The lender always owns the obligation secured by the deed of trust and is always the secured party. Plaintiffs' deed of trust reflects this fact. *Exh. 2* at 2.  Hence, the trustee, pursuant to RCW 61.24.080(2), must always pay the proceeds of the sale to the lender.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS
                                                          25
                                                                    John Wilson, pro se
                                                          19318 99th Ave SE, Snohomish, WA 98296
                                                                    E: john.wilson.udi@gmail.com
                                                                    T: 206.854.6851

5.58   In *Brown*, M&T loaned nothing. It did not own the loan or the note. It merely received the blank-endorsed promissory note from Freddie Mac, without giving any value for the note.

5.59   The Court's holding in *Brown* notwithstanding, M&T was not the beneficiary of the deed of trust in *Brown!*

**e.   M&T Was Not the Person for Whose Benefit the Deed of Trust Irrevocably Conveyed Darlene Brown's Property to the Trustee, in Trust, with Power of Sale.**

5.60   The deed of trust secures ***to the lender/secured party/beneficiary*** repayment of the loan by the economic benefit of each payment the note requires the homeowner/borrower to make to the noteholder. *Exh. 2*, Transfer of Rights in the Property Section at 2.

5.61   And for the purpose of securing ***to the lender/secured party/beneficiary*** repayment of the loan, the deed irrevocably grants to the trustee the homeowner/borrower's real property, in trust, with power of sale. *Id.*

5.62   A deed of trust does not secure repayment of a loan to a noteholder that does not own the note it holds, which is what M&T was in *Brown*. Moreover, because the deed irrevocably conveys the property to the trustee, in trust, with power of sale, ***for the purpose of securing to the lender/secured party/beneficiary repayment of the loan*** (*Id.*), the trustee, under the terms of the deed of trust, has no legal authority to sell the property unless the sale is for the benefit of the lender/*secured party/beneficiary.*

**f.   M&T Did Not Own the Economic Benefit of Any Payment the Note Required Darlene Brown to Make to M&T.**

5.63   Under the terms in the Transfer of Rights in the Property Section of a deed of trust, the beneficiary must own the economic benefit of each payment the note requires the

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

26

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

homeowner/borrower to make to the noteholder. The Transfer of Rights in the Property Section of Plaintiffs' deed of trust reads as follows:

> This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note; and (iii) the performance of all agreements of borrower to pay fees and charges arising of the Loan whether or not herein set forth. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, ***with power of sale***, the following described property located in Snohomish County, Washington:

> THE SOUTH 158 FEET OF TRACT 237 CATHCHART DIVISION NO. 1, SNOHOMISH COUNTY ACCORDING TO THE PLAT THEREOF, RECORDED IN VOLUME 9 OF PLATS. PAGE 44 THROUGH 47, INCLUSIVE, RECORDS OF SNOHOMISH COUNTY, WASHINGTON.

> Which currently has the address of 19318 99th Ave. SE, Snohomish, Washington 98296:

> TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." *Exh. 2,* Transfer of Rights in the Property Section at 2. *Emphasis added.*

A copy of the DOT is attached to Plaintiff John Wilson's Declaration as Exhibit 2 and is incorporated herein by this reference.

5.64   To accurately decipher the meaning of the language in the Section, it is necessary to granularly analyze the grammatical impact of the language. Therefore, the analysis, though necessary, is somewhat tedious. Plaintiffs apologize to the reader in advance for any tedium caused the reader by the granularity of the analysis.

5.65   The noun phrase "This Security Instrument" is the subject of the first sentence in the Transfer of Rights in the Property Section of the DOT. The verb and simple predicate is "secures." *See The Handbook of Good English,* POCKET BOOKS, a div. of Simon & Schuster, Inc. (1991)

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

27

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

("Handbook") at 384. "Secures" is not defined in the DOT and therefore has its ordinary meaning, which may be determined by reference to a standard dictionary. *State v. Sullivan*, 143 Wn.2d 162, 184-85, 19 P.3d 1012 (2001); *see also Medina v. Pub. Util. Dist. No. 1 of Benton County*, 147 Wn.2d 303, 315, 53 P.3d 993 (2002). *Black's* defines "secure" as "To give security; to assure of payment, ***performance***, or indemnity; to guaranty or make certain the payment of a debt or discharge of an obligation. One 'secures' his ***creditor*** by giving him a lien, ***mortgage***, pledge, or other security, to be used in case the debtor fails to make payment." *Black's* at 1215. The adverbial prepositional phrase "to Lender" modifies the verb "secures." "Lender" is the object of the preposition "to" in the phrase. Thus, the Brown Court's holding notwithstanding, the Lender, and no one else in the world, is the secured party/beneficiary under a deed of trust.

5.66   The noun phrase "the repayment" in "(i)" of the first sentence of the the Section is the first direct object of "secures." *The Handbook of Good English,* POCKET BOOKS, a div. of Simon & Schuster, Inc. (1991) ("Handbook") at 372. Subpart "(i)" contains three additional objects of "secures": "renewals, extensions, and modifications." *Id.* The adjectival prepositional phrase "of the Note" modifies "renewals, extensions, and modifications." *Id.* at 386-87.

5.67   Subpart "(ii)" of the first sentence is the portion of the first sentence that determines who owns the economic benefit of each payment the note requires the homeowner/borrower to make to the noteholder. The noun phrase "**the performance**" in "(ii)" is an object of the verb "secures." *Id.* at 372. The adjectival prepositional phrase that comprises the remainder of "(ii)," "of Borrower's covenants and agreements under this Security Instrument and the Note," modifies "the performance." *Id.* at 386-87.

5.68   The word "performance" is not defined in the DOT. Therefore, the word has its ordinary meaning. "Performance" is defined as "the ***execution or accomplishment*** of work, acts,

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS
28
John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

feats, etc. *Webster's Encyclopedic Unabridged Dictionary of the English Language* (1996) ("Webster's") at 1070. The word "covenant" in subpart "(ii)" is not defined in the DOT. It is defined in Black's as "an ***agreement***, convention, or ***promise*** of two or more parties, ***by deed in writing***, signed, and delivered, by which either of the parties pledges himself to the other that something is either done, ***or shall be done***, or shall not be done, or stipulates for the truth of certain facts. . .. The ***term is currently used primarily with respect to promises in conveyances or other instruments related to real estate***." *Black's* at 327.

5.69   Monthly note payments made, not the promise to make monthly note payments, are the result of a borrower's ***performance*** of a promise to make monthly note payments. If a reader of this memorandum promises his or her child a bike for the child's birthday, the promise is ***performed*** when the bike is delivered, not when the promise is made. Hence, a deed of trust, which "secures to the Lender "the ***performance*** of Borrower's covenant [promise to make monthly note payments] under . . . the Note" secures to the lender the payments required by the note, not the promise to make the payments.

5.70   The note is merely the promise to make payments; it is not the payments. Accordingly, the widely held belief that the deed of trust secures the promissory note is incorrect. It secures what the note represents: repayment of the loan the lender delivered to the borrower at the loan closing, plus a reasonable profit, by the payments the note requires the borrower to make. And since the lender, because she, he, or it owns the note, owns the economic benefit of each payment the note requires the borrower to make, a deed of trust, in practical terms, secures *to the lender* repayment of the economic benefit the lender delivered to the borrower at the loan closing by the economic benefit of each payment the note the borrower delivered to the lender at the loan closing requires the borrower to make to the noteholder.

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206 854 6851

5.71   This is what the parties agreed to at the loan closing. Why would their security agreement secure anything other than what they agreed to? The simple answer is it would not secure anything else.

5.72   M&T did not own the economic benefit of any payment the promissory note required Ms. Brown to make to M&T. Therefore, it was not the beneficiary of the DOT.

### g.   M&T Did Not Own Ms. Brown's Obligation to Repay the Loan.

5.73   The original lender owns the borrower's obligation to repay the debt created by the original lender's delivery of the loan to the borrower. Under Section 13 of the deed of trust, any subsequent purchaser steps into the original lender's shoes and is bound by and benefits from the covenants and agreements of the deed to the same extent as the original lender. *Exh. 2,* § 13 at 12. In *Brown*, Freddie Mac owned the loan and never relinquished any of its ownership rights to M&T. Consequently, Freddie Mac, not M&T, owned Ms. Brown's obligation to repay the loan, and therefore Freddie Mac, not M&T, was the secured party/beneficiary under the terms of the Contract.

### h.   M&T Did Not Own the Beneficial or Equitable Interest in Ms. Brown's Home.

5.74   The deed of trust irrevocably grants and conveys to the trustee, in trust, with power of sale, ***for the benefit of the lender***, the homeowner/borrower's real property. *Id., Transfer of Rights in the Property Section* at 2. The sole purpose for this conveyance is to secure ***to the lender*** repayment of the loan by the economic benefit of each payment the note requires the borrower to make to the noteholder.  If the borrower fails to make the payments required by the note, and the lender satisfies the conditions enumerated in Section 22 of the deed, the trustee sales the property

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

at a foreclosure sale and pays the proceeds of the sale (i.e., the foreclosure proceeds) to the owner of the beneficial or equitable interest in the homeowner/borrower's property.

5.75   Again, in *Brown*, the Court acknowledged that foreclosure proceeds would have been the property of Freddie Mac, the owner of the beneficial interest in Doris Brown's real property. *Brown,* 184 Wn. 2d at 524. Accordingly, notwithstanding the Court's holding in *Brown*, Freddie Mac, not M&T, was the secured party/beneficiary of the DOT.

**3.          The Deed of Trust Follows a Transfer of Ownership of the Loan, not a Transfer of the Right to Enforce the Note.**

5.76   It is undisputed that M&T Bank, the servicer in *Brown*, was not a party to the deed of trust contract.

5.77   Generally, a person that is not a party to a contract cannot enforce the contract. *Clarity Capital Mgmt. Corp. v. Ryan*, No. 82022-2-I, at *4-5 (Wash. Ct. App. 2021).

5.78   However, there is an exception to this general rule. If the owner of the contract rights assigns its rights to a third party, the assignee "steps into the shoes of the assignor, and has all the rights of the assignor." *Puget Sound Nat'l Bank v. Dep't of Revenue*, 123 Wn.2d 284, 292, 868 P.2d 127 (1994); *Carlile v. Harbour Homes, Inc.*, 147 Wn.App. 193, 208, 194 P.3d 280 (2008) review granted and dismissed, 166 Wn.2d 1015 (2009).

5.79   In *Brown*, ***Freddie Mac did not assign all its rights in the promissory note*** to M&T Bank. "There are both enforcement rights and ownership rights associated with a promissory note." *CitiMortgage, Inc. v. Moseley*, No. 53819-9-II, at *1 (Wash. Ct. App. Jan. 20, 2021). The bundle of rights associated with enforcement of the note belongs to the noteholder, and the bundle of rights associated with ownership of the note belongs to the note owner.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S.AND STATE CONSTITUTIONS

John Wilson, pro se
19318 99ᵗʰ Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

5.80   Each of the rights in the note owner's bundle of rights is exclusive of each of the rights in the noteholder's bundle of rights; this is true, though less visibly so, even if the note owner and the noteholder are the same person. By transferring the blank-endorsed promissory note to M&T while retaining ownership of the note, Freddie Mac transferred all the note enforcement rights to M&T and retained all the note ownership rights.

5.81   Ownership of the borrower's obligation to repay the loan by the economic benefit of the payments required by the note is a note-ownership right. *See Brown,* 184 Wn. 2d at 524. A deed of trust secures to the lender repayment of the loan by the payments the note requires the borrower to make to the noteholder. *DOT, Transfer of Rights in the Property Section* at 2. That is, it secures rights that belong to the note owner, not rights that belong to the noteholder (the PETE).

5.82   In *Brown,* the Court openly acknowledged that the right to repayment of the loan by the payments the UCC requires the homeowner to make to the noteholder, rights that belong to a note owner, are not transferred when a lender, while retaining ownership of a promissory note, blank endorses the note and hands it to a servicer:

> Under the UCC, promissory notes embrace two sets of rights. The first set of rights is held by the "person entitled to enforce" the note, a legal term of art commonly referred to as "PETE" status. See RCW 62A.3–301 (definition). The second set of rights is ownership of the note. The owner has the right to ***the economic benefits of the note, such as monthly mortgage payments*** and ***foreclosure proceeds***.
> *Brown,* 184 Wash. 2d at 524.

5.83   The right to repayment of the loan and the right to the economic benefit of each monthly mortgage payment the note requires the borrower to make to the noteholder (i.e., the payment right) are the rights a deed of trust secures. *DOT, Transfer of the Rights in the Property Section at 2.* Hence, because the deed secures to the lender repayment of the loan by the economic

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206 854 6851

benefit of each payment the note requires the borrower to make to the noteholder, the deed of trust is never transferred to any third party unless the right to repayment of the loan by the economic benefit of each payment the note requires the borrower to make to the noteholder is transferred.

**4.    Security Follows the Note Doctrine Applies to the Sale of a Promissory Note.**

5.84    The note owner owns the borrower's obligation to repay the loan. There can be no dispute about this fact.

5.85    Because the note owner owns the borrower's obligation to repay the loan, it owns the borrower's promissory note, i.e., the payment right, that it accepts at the loan closing as the borrower's method of repaying the loan. Ownership of the borrower's obligation to repay the loan and the economic value of each payment the borrower is required to make to the noteholder are ownership rights that are normally transferred by sale.

5.86    That is why the Security Follows the Note Doctrine, which is the basis upon which the *Brown* Court decided the security followed Freddie Mac's transfer of the blank-endorsed note to M&T,[8] is, and always has been, a doctrine that relates to the sale of a secured promissory note.

5.87    Plaintiffs are aware that the conventional wisdom is to the contrary. But Plaintiffs are also aware that those who truly understand the meaning of the Doctrine, and who are officially

---

[8] *Brown*, 184 Wash. 2d at 530 n.9 ("The parties agree the note is secured by a publicly recorded deed of trust, but the deed is not in this court's record. The deed's absence from the record does not affect this case because RCW 62A.9A–203(g) " 'codifies the common-law rule that a transfer of an obligation secured by a security interest or other lien on personal or real property also transfers the security interest or lien,' " UCC Report on Mortgage Notes, supra, at 12 n. 44 (quoting RCWA 62A.9A–203 U.C.C. cmt. 9); see alsoRCW 62A.9A–203(g) ( "The attachment of a security interest [i.e., the "interest of a ... buyer of ... a promissory note," RCW 62A.1–201(b)(35),] in a right to payment ... secured by a security interest ... on personal or real property is also attachment of a security interest in the security interest, mortgage, or other lien."). This statute "explicitly provides that ... the assignment of the interest of the seller ... automatically transfers a corresponding interest in the mortgage to the assignee." UCC Report on Mortgage Notes,supra, at 12. The parties present no arguments relating to the deed of trust as distinct from the note.").

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S.AND STATE CONSTITUTIONS

33

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

1 charged with the responsibility of interpreting the true meaning of the Doctrine, agree with

2 Plaintiffs.

3     5.88   The American Law Institute and the Uniform Law Commission, the organizations

4 that jointly sponsor the Uniform Commercial Code, established the Permanent Editorial Board

5 for the Uniform Commercial Code (PEB) in 1961. Among other things, the PEB is charged with

6 issuing commentaries about the provisions of the UCC in a manner and "at times best calculated

7 to advance the uniformity and orderly development of commercial law." *Report of the Permanent*

8 *Editorial Board for the Uniform Commercial Code, Application of the Uniform Commercial Code*

9 *to Selected Issues Relating to Mortgage Notes (2011)* ("the Report") at (ii). The *Brown* Court

10 correctly described the Report as "authoritative." *Brown,* 184 Wn. 2d at 524.

11     5.89   The Report addresses the UCC's application to four mortgage related issues. The

12 third of the four issues addressed in the Report is "What is the Effect of Transfer of an Interest in

13 a Mortgage Note on the Mortgage Securing It?" *The Report* at 12.   In other words, under what

14 circumstances does the security follow the note; the precise question the Washington Supreme

15 Court was required to answer in *Brown*. *Brown*, 184 Wash. 2d at 514. The discussion of this issue

16 in the Report is authoritative, and the conclusion the PEB reaches is definitive—the *security*

17 *follows a __sale__ of the note*:

        What if a note secured by a mortgage is *__sold__* (or the note is used as
collateral to secure an obligation), but the parties do not take any additional actions
to assign the mortgage that secures payment of the note, such as execution of a
recordable assignment of the mortgage? UCC Section 9-203(g) explicitly provides
that, *in such cases*,[9] the *__assignment__*[10] of the interest of the seller or other grantor
of a *__security interest__*[11] in the note automatically transfers a corresponding interest

---

[9] To what does the adjective "such" refer in the prepositional phrase, "in such cases"? It refers to notes secured by a mortgage that has been sold, but the parties have taken no additional action to assign the mortgage that secures payment of the note.

[10] "The transfer by a party of all of its rights to some kind of property, usually intangible property such as rights in a lease, *__mortgage__*, agreement of sale or a partnership." *Black's* at 109.

[11] "*__Security interest__*" includes any interest of . . . a buyer of . . . a promissory note in a transaction that is subject to Article 9A of this title." RCW 62A.1-201(b)(35). The buyer of a promissory note owns the note.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

34

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

in the mortgage to the assignee[12]: "The attachment of a security interest in a ***right to payment or performance*** secured by a security interest or other lien on personal or real property is also attachment of a security interest in the security interest, mortgage, or other lien." (As noted previously, a "security interest" in a note includes the right of a buyer of the note.) While this question has provoked some uncertainty and has given rise to some judicial analysis that disregards the impact of Article 9,(fn. 43) the UCC is unambiguous: ***the sale of a mortgage note*** (or other grant of a security interest in the note) not accompanied by a separate conveyance of the mortgage securing the note does not result in the mortgage being severed from the note.**(fn. 44)** It is important to note in this regard, however, that UCC Section 9-203(g) addresses only whether, as between the seller of a mortgage note (or a debtor who uses it as collateral) and the buyer or other secured party, the interest of the seller (or debtor) in the mortgage has been correspondingly transferred to the secured party.

. . . . . . .

**44** Official Comment 9 to UCC § 9-203 confirms this point: "Subsection (g) codifies the common-law rule that a transfer of an obligation secured by a security interest or other lien on personal or real property also transfers the security interest or lien." Pursuant to UCC § 1-302(a), the parties to the transaction may agree that an interest in the mortgage securing the note does not accompany the note, but such an agreement is unlikely. See, e.g., Restatement (3d), Property (Mortgages) § 5.4, comment a ("It is conceivable that on rare occasions a mortgagee will wish to disassociate the obligation and the mortgage, but that result should follow only upon evidence that the parties to the transfer so agreed.").

*The Report* at 12. Superscript and emphasis added.

5.90   Any lawyer or judge who reads the above quotation and fails to conclude that the Security Follows the Note Doctrine means the security follows ***the sale*** of a secured promissory note is either determined to be willfully ignorant of the meaning of the Doctrine, or too unsophisticated in his or her understanding of this area of the law to formulate an opinion that is worthy of serious consideration. This statement is not an attempt to put anyone down. It is a statement of fact.

---

[12] RCW 62A.9A-203(g) is the codification of the common law Security Follows the Note Doctrine.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

35

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

5.91   In *Brown*, M&T was not a party to the DOT contract. A person who is not a party to a contract may not seek to enforce the contract. *Clarity Capital Mgmt. Corp. v. Ryan*, No. 82022-2-I, at *4 (2021). The *Brown* Court had to surmount this formidable legal obstacle before it could hold that M&T, despite not being a party to Ms. Brown's deed of trust contract, was the beneficiary of the deed of trust and was therefore entitled to enforce it.

5.92   In attempting to overcome this obstacle, the Court relied on fn. 44 of the Report. *Brown*, 184 Wn. 2d at 530, fn. 9.[13] Footnote 44 is part of the above quotation. It supports the following statement in the text of the discussion of the third issue in the Report:

> "While this question has provoked some uncertainty and has given rise to some judicial analysis that disregards the impact of Article 9,(**fn.43**) the UCC is unambiguous: ***the sale of a mortgage note*** (or other grant of a security interest in the note) not accompanied by a separate conveyance of the mortgage securing the note does not result in the mortgage being severed from the note.(**fn.44**)"
> *The Report* at 12. Emphasis added.

5.93   The quote immediately above makes obvious the problem with the Court's use of fn. 44 as the foundation for its finding that Freddie Mac's transfer of the blank-endorsed note to M&T, while Freddie Mac retained ownership of the note, also transferred the deed of trust that secured the note.

5.94   Footnote 44 directly supports a statement in the text that ***the sale of a mortgage note*** carries with it the deed of trust that secures the note. In other words, the security follows the note

---

[13] The parties agree the note is secured by a publicly recorded deed of trust, but the deed is not in this court's record. The deed's absence from the record does not affect this case because RCW 62A.9A–203(g) " 'codifies the common-law rule that a transfer of an obligation secured by a security interest or other lien on personal or real property also transfers the security interest or lien,' " UCC Report on Mortgage Notes,supra, at 12 n. 44 (quoting RCWA 62A.9A–203 U.C.C. cmt. 9); see also RCW 62A.9A–203(g) ( "The attachment of a security interest [i.e., the "interest of a ... buyer of ... a promissory note," RCW 62A.1–201(b)(35),] in a right to payment ... secured by a security interest ... on personal or real property is also attachment of a security interest in the security interest, mortgage, or other lien."). This statute "explicitly provides that ... the assignment of the interest of the seller ... automatically transfers a corresponding interest in the mortgage to the assignee." UCC Report on Mortgage Notes, *supra*, at 12. The parties present no arguments relating to the deed of trust as distinct from the note.

COMPLAINT FOR DECLARATORY JUDGMENT,CPA
AND U.S.AND STATE CONSTITUTIONS

36

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

only when the note is **_sold_**. There simply is no other way to interpret the language in the quoted sentence.

5.95    For that matter, the security follows **_the sale_** of a secured promissory note is the only rational way to interpret the meaning of the entire discussion in the Report under the Heading, "What is the Effect of Transfer of an Interest in a Mortgage Note on the Mortgage Securing It?"

**5.  Finally, As a Matter of Law, The Security Follows the Note Doctrine Could Not Have Applied to Freddie Mac's Transfer of the Note to M&T.**

5.96    RCW 62A.9A-109 establishes the scope of Article 9A.

5.97    RCW 62A.9A-109(a)(3) unambiguously states that Article 9A applies to the **_sale_** of a promissory note. Additionally, RCW 62A.9A-109(d)(5) explicitly states the following: "(d) **Inapplicability of Article.** This Article does not apply to: . . . (5) An assignment of . . . promissory notes which is **_for the purpose of collection only_**[.]"

5.98    By blank-endorsing the Note and handing it to M&T, thereby purportedly giving M&T **_the right to enforce the note_**, Freddie Mac assigned the promissory note to M&T for the purpose of collecting it. *See* Freddie Mac *Single-Family Seller/Servicer Guide Chapter 8107:* Document Custody 8107.1(a)-(b): Servicer Responsibilities Related to Document Custody (10/20/21) at p. 8107-1. A copy of Chapter 8107.1(a)-(b) is attached to Plaintiff John Wilson's Declaration as Exh. 4 and is incorporated herein by this reference. Accordingly, none of the provisions in Article 9A applied to the transfer of the note from Freddie Mac to M&T.

5.99    RCW 62A.9A-203(g), the codification of the common law Security Follows the Note Doctrine, is a provision in Article 9A. Therefore, notwithstanding the Supreme Court's holding in *Brown*, the Security Follows the Note Doctrine did not apply to Freddie Mac's transfer of the Note to M&T.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS
37                                        John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

5.100  Without the Security Follows the Note Doctrine as the basis for the Brown decision, the decision is baseless. M&T had no other connection to the deed of trust.

5.101  By altering the terms of the deed of trust contract and imposing new conditions, the current version of the DTA not only impairs the deed of trust contract, but also, for the many reasons stated above, invalidates the deed of trust contract. And it impairs and invalidates the contract not for a significant and legitimate public purpose, but for a special purpose—to aid banking institutions in their efforts to seize Washington citizens' homes.

5.102  The DTA violates Article 1, § 23 of the Washington Constitution and Article 1, § 10, Clause 1 of the U. S. Constitution because it not only impairs the deed of trust contract, but also, for the many reasons stated above, invalidates the deed of trust contract for no significant or legitimate public purpose.

## VI          CLAIMS FOR RELIEF

6.1      Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

6.2      The statute of limitations, RCW 4.16.040(1), expired on the entire debt and all note payments due and payable between January 1, 2011 and May 1, 2017 more than six (6) years before Defendants initiated the current non-judicial foreclosure proceeding.

6.3      Additionally, the DTA invalidates Plaintiffs' deed of trust for no significant or legitimate public purpose.

6.4      Plaintiffs seek declaratory relief on grounds including but not limited to the following:

**A.      Violation of RCW 4.16.005 and RCW 4.16.040(1)**

6.5      RCW 4.16.005 provides: ". . ., actions can only be commenced within the periods provided in this chapter after the cause of action has ***accrued***."

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

38

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206 854 6851

6.6    RCW 4.16.040(1) provides: "The following actions shall be commenced within six years: (1) An action upon a contract in writing, . . .."

6.7    For the reasons stated herein above, the cause of action for the entire debt **_accrued_** on April 2, 2011, and therefore expired on April 2, 2017.

6.8    Because the statute of limitations has expired for the entire debt, and therefore the non-judicial foreclosure violates RCW 4.16.040(1), Plaintiffs are entitled to a judgment declaring the non-judicial foreclosure action void.

6.9    Alternatively, because the statute of limitations has expired on all installment payments that became due and payable between January 1, 2011 and May 1, 2017, and, consequently, Defendants seek to recover debt payments through the non-judicial foreclosure proceeding that are unrecoverable as a matter of law, Plaintiffs are entitled to a judgment declaring the non-judicial foreclosure proceeding void.

**B.**    **Violation of Washington Const. Art. 1, § 23 and U. S. Const. Art. 1, § 10, Clause 1.**

6.10    Washington Const. Art. I, § 23 provides:  "BILL OF ATTAINDER, EX POST FACTO LAW, ETC. No bill of attainder, ex post facto law, or law impairing the obligations of contracts shall ever be passed."

6.11    U. S. Const. Art. 1, § 10, Clause 1 provides:  "**Proscribed Powers**. No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility."

6.12    The two Constitutional provisions are interpreted coextensively.

COMPLAINT FOR DECLARATORY JUDGMENT,CPA
AND U.S.AND STATE CONSTITUTIONS

39

John Wilson, pro se
19318 99ᵗʰ Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

6.13    The DTA not only violates Plaintiffs' deed of trust contract, but also, for the many reasons provided herein above, invalidates the contract for no public purpose, legitimate or otherwise. As such, the DTA violates Article 1, § 23 of the Washington Constitution and Article 1, § 10, Clause 1 of the U. S. Constitution and, therefore, is void.

6.14    Because the DTA violates Article 1, § 23 of the Washington Constitution and Article 1, § 10, Clause 1 of the U. S. Constitution, Plaintiffs are entitled to a judgment declaring the DTA unconstitutional and void.

## VII         ENTITLEMENT TO DECLARATORY RELIEF

7.1    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

7.2    For reasons including but not limited to those stated herein, an actual dispute exists between Plaintiffs and Defendants, which parties have genuine and opposing interests, which interests are direct and substantial, and of which a judicial determination will be final and conclusive.

7.3    Application of RCW 4.16.005 and 4.16.040(1) to the facts of this case bars Defendants from continuing to pursue collection of the loan and/or of the monthly installment payments that became due and payable under the Note between January 1, 2011 and May 1, 2017.

7.4    Therefore, Plaintiffs are entitled to a judgment declaring the non-judicial foreclosure proceeding void.TA

7.5    Additionally, the DTA is void because it violates Article 1, § 23 of the Washington Constitution and Article 1, § 10, Clause 1 of the U. S. Constitution.

7.6    Defendants are conducting the non-judicial foreclosure proceedings under the DTA.

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

40

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

7.7    Therefore, Plaintiffs are entitled to a declaratory judgment that the DTA is void as violative of Article 1, § 23 of the Washington Constitution and Article 1, § 10, Clause 1 of the U. S. Constitution, and permanently enjoining Defendants' right to seek repayment of the loan.

## VIII  ENTITLEMENT TO CPA RELIEF

8.1    Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

8.2    Based on Plaintiffs' having proven the five elements necessary to sustain a CPA claim, Plaintiffs are entitled to injunctive relief pursuant to RCW 19.86.080, compensation for any damages that they have proven that were caused by Defendants unlawful actions, an order prohibiting Defendants and their heirs and assigns from attempting to collect the debt in the future, and reimbursement of Plaintiffs' costs and reasonable attorneys' fees pursuant to RCW 19.86.080.

## IX  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully pray for the following relief:

A.    Entry of a declaratory judgment that Washington's Deeds of Trust Act violates Plaintiffs' rights under Article 1, § 23 of the Washington Constitution and Article 1, § 10, Clause 1 of the U. S. Constitution and therefore is void;

B.    Entry of a Declaratory Judgment that the non-judicial foreclosure proceeding that is the subject of this litigation is void;

C.    Entry of a Declaratory Judgment that the statute of limitations has run on Defendants' right to collect the debt Plaintiffs incurred when they entered into the loan relationship with WaMu on April 22, 2005;

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS
41
John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

D.     Entry of a Declaratory Judgment that the statute of limitations has run on the installment note payments that became due and payable between January 1, 2011, and May 1, 2017, inclusive.

E.     Pursuant to RCW 19.86.090, an injunction permanently preventing Defendants from collecting or attempting to collect the debt Plaintiffs' incurred on April 22, 2005 and/or any note installment payments that became due and payable between January 1, 2011, and May 1, 2017;

F.     Pursuant to RCW 19.86.090, an award for the actual damages Plaintiffs have sustained, together with the costs of the suit, including a reasonable attorney's fee, and a trebling of the damage award.

G.     Such other and further relief as may follow from the entry of a declaratory judgment; and

H.     Any further relief that this Court may deem just and proper.

DATED this 28th day of April 2023.

PRESENTED BY:

JOHN R. WILSON                                JACQUELINE M. WILSON

_____                      _____

John Wilson, Plaintiff pro se                Jacqueline Wilson, Plaintiff pro se
19318 99th Ave. SE                           19318 99th Ave. SE
Snohomish, WA 98296                          Snohomish, WA 98296

COMPLAINT FOR DECLARATORY JUDGMENT, CPA
AND U.S. AND STATE CONSTITUTIONS

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com
T: 206.854.6851

John Wilson, ProSe, T: 206.854.6851, E: john.wilson.udi@gmail.com
19318 99th Ave SE, Snohomish, WA 98296

**FILED**

APR 28 2023

HEIDI PERCY
COUNTY CLERK
SNOHOMISH CO. WASH.

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## FOR THE COUNTY OF SNOHOMISH

|  |  |
|---|---|
| JOHN and JACQUELINE WILSON,<br> a married couple<br>　　　　　　　　Plaintiffs,<br><br>vs.<br><br>JPMORGAN CHASE, N.A., and<br>QUALITY LOAN SERVICE CORP OF<br>WASHINGTON<br>　　　　　　　　Defendants | Case No.<br>**23 2 03142 31**<br><br>**JOHN R. WILSON DECLARATION** |

I, John R. Wilson, hereby declare as follows:

I am a U.S. citizen over the age of eighteen and competent to make this declaration. I have the personal knowledge required to execute this declaration, and I hereby confirm the accuracy of the information set forth herein. If sworn as a witness, I could competently testify to the facts listed below:

**1.** Plaintiffs signed the Washington Mutual Bank Promissory Note ("Note") contract and Deed of Trust ("DOT") contract securing the Note on April 22, 2005. The Note and DOT are attached to this Declaration as Exhibits 1 (Note) and 2 (DOT) respectively.

**2.** Plaintiffs signed the Note and DOT believing that we were securing to the original lender/note owner and any subsequent owners of the Loan, **_and only to the lender/note owner and subsequent owners of the Loan_**, two separate sets of rights: (a) the ownership rights; and the noteholder rights.

JOHN R. WILSON DECLARATION

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com;  T: 206.854.6851

3.  Plaintiffs have made no payments on the Loan since December 2010.

4.  On February 28, 2011, Chase sent a notice to Wilsons entitled **"Acceleration Warning – Intent To Foreclose."** A copy of the Warning Letter is attached hereto as Exhibit 3.

5.  On December 6, 2022 QLSCW sent Plaintiffs a <u>seventh</u> (7th) Notice of Trustee Sale. A copy of the Notice is attached to this Declaration as Exhibit 4.

6.  The Notice set April 21, 2023, as the trustee's sale date.

7.  Subsequently, the trustee, Quality Loan Services of Washington ("Quality") continued the sale to May 5, 2023. A copy of the continuance notice is attached to this Declaration as Exhibit 5.

8.  The NOTS requires that Plaintiffs pay arrearages of $533,602.06, $275,755.24 of which is unenforceable, time-barred debt.

9.  Plaintiffs believed wholeheartedly that they were required to pay $533,602.06 to reinstate the loan and stop the foreclosure. Plaintiffs believed it so strongly that we never attempted to obtain financing in the amount of the actual arrearages--$257,846.82.

10. Plaintiffs might not have been able to obtain $257,846.82 to pay off the arrearages, but we will never know because we were deceptively deprived of the opportunity to try.

11. This unlawful attempt to foreclose, and previous attempts to foreclose as well, has injured in our money and property. We have had to incur the costs of unnecessary court filings, fuel, automobile wear and tear, printer ink, reams of paper, office supplies, meeting with and consulting with knowledgeable others re: Chase's and Quality's unlawful foreclosure conduct, inability to pursue needed patents and investments for my current hospital medication cost & error reduction system, which is in development, lost time in home maintenance work, anxiety linked health costs, and others.

JOHN R. WILSON DECLARATION

2

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com;  T: 206.854.6851

1    I swear under penalty of perjury under the laws of the State of Washington that the

2  information and statements contained in the declaration are true.

3       Respectfully submitted and executed at Snohomish, Washington this 28th day of April,

4  2023

5

6

7  John R. Wilson, pro se for Plaintiffs
   19318 99th Ave SE, Snohomish, WA 98296

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  JOHN R. WILSON DECLARATION

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com;  T: 206.854.6851

# DECLARATION

# EXHIBIT 1

# ADJUSTABLE RATE NOTE
## (12-MTA Index - Payment and Rate Caps)

01-0836-068544776-5

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __125%__ OF THE ORIGINAL AMOUNT (OR $__708,750.00__). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

_____April 22, 2005_____          _____BELLEVUE_____     __Washington__
                                           (City)                     (State)

_____19318 99TH AVE SE, SNOHOMISH, WA 98296_____
                              (Property Address)

## 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $___567,000.00___ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is _____Washington Mutual Bank_____. I will make all payments under this Note in form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

## 2. INTEREST
Interest will be charged on unpaid Principal until the full amount has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of __4.851__%. Thereafter until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of __1.750__%. The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS
### (A) Time and Place of Payments
I will pay Principal and interest by making payments every month. In this Note, "payments" refer to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I will make my monthly payments on __1st__ day of each month beginning on _____June, 2005_____, I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on _____May 1, 2045_____, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at __9451 CORBIN AVENUE, NORTHRIDGE, CA 91324__ _____, or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments
Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $__1,643.36__, unless adjusted at an earlier time under Section 4(H) of this Note.

32859 (11-01)                    **Page 1 of 6**

01-0836-068544776-5

**(C) Payment Changes**

My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may further change on the ___1st___ day of ___June, 2005___, and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index**

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding ___Two & Sixty-Eight-Hundredths___ percentage points ___2.680___ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than ___Nine & Ninety-Five-Hundredths___ percentage points ___9.950___ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing ___June 1, 2006___, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

01-0836-068544776-5

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on   the maturity date in substantially equal payments.  For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the payment from the amount of the interest portion and will ad the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate.  For each month that the  monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to   **125%**   of the principal amount original borrowed.  In the event my unpaid Principal would otherwise exceed that   **125%**   limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation.  The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the   **FIFTH**   anniversary of the due date of the first monthly payment, and on that same day every   **FIFTH**   year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time.  I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment".  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note.  If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.  My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment.  However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then;  (a) any such loan charge shall be reduced by the amount

01-0836-068544776-5

necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**Miscellaneous Fees:** I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $ _15.00_ . Lender reserves the right to change the fee from time to time without notice except as may be required by law.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of _Fifteen_ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be _5.000_ % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once of each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

01-0836-068544776-5

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver

01-0836-068544776-5

to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

X _____
JOHN R WILSON

X _____
JACQUELINE M WILSON

# Prepayment Fee Note Addendum

01-0836-068544776-5

This Note Addendum is made this 22nd day of April, 2005 and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned (the "Borrower") in favor of _____ Washington Mutual Bank _____ (the "Lender") and dated as of even date herewith (the "Note").

This Note Addendum amends the provision in the Note regarding the Borrower's right to prepay as follows:

BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal before they are due. Any payment of principal, before it is due, is known as a "prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment." A prepayment of the full amount of the unpaid principal is known as a "full prepayment."

If I make a full prepayment, I may be charged a fee as follows:

If Noteholder receives a prepayment on or before the first anniversary of the date of the Note, the Prepayment Fee shall be equal to Three percent ( 3.000 %) of the original loan amount. If Noteholder receives prepayment after the first anniversary but on or before the second anniversary of the date of the Note, the prepayment fee shall be Two percent ( 2.000 %) of the original loan amount. If Noteholder receives prepayment after the second anniversary but on or before the Third anniversary of the date of the Note, the prepayment fee shall be One percent ( 1.000 %) of the original loan amount. Thereafter, prepayment of the Note shall be permitted without any Prepayment Fee.

The Prepayment Fee shall be payable upon a full prepayment, voluntary or involuntary, including but not limited to a prepayment resulting from Noteholder's permitted acceleration of the balance due on the Note. Notwithstanding the foregoing, nothing herein shall restrict my right to prepay at any time without penalty accrued but unpaid interest that has been added to principal.

Notwithstanding the foregoing, Lender shall not impose a Prepayment Fee in the event that:

a) The loan is fully prepaid as result of disposing of the security property and Borrower obtains a new loan from Lender to purchase another property. The prepayment of the loan must occur simultaneously with the origination of the new loan; and
b) such prepayment occurs no earlier than the first anniversary of the date of the Note.

Nothing herein shall be deemed to be a commitment by Lender to make Borrower another loan. Borrower understands and agrees that should Borrower want to obtain a new loan from Lender, Borrower must meet all underwriting and other requirements of Lender in effect at the time Borrower applies for the new loan.

32890 (04-04) Page 1 of 2

01-0836-068544776-5

When I make a full or partial prepayment I will notify the Noteholder in writing that I am doing so. Any partial prepayment of principal shall be applied to interest accrued on the amount prepaid and then to the principal balance of the Note which shall not reduce the amount of monthly installments of principal and interest (until reamortized as set forth in the Note at the next Payment Change Date) nor relieve me of the obligation to make the installments each and every month until the Note is paid in full. Partial prepayments shall have no effect upon the due dates or the amounts of my monthly payments unless the Noteholder agrees in writing to such changes.

**NOTICE TO THE BORROWER**

**Do not sign this Note Addendum before you read it. This Note Addendum provides for the payment of a Prepayment Fee if you wish to repay the loan prior to the date provided for repayment in the Note.**

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Note Addendum.

X _____

JOHN R WILSON

X _____

JACQUELINE M WILSON

32890 (04-04)                                    Page 2 of 2

**ADJUSTABLE RATE RIDER**
**(12-MTA Index - Payment and Rate Caps)**

01-0836-068544776-5

THIS ADJUSTABLE RATE RIDER is made this __22nd__ day of __April, 2005_____,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of
Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned
(the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
_____Washington Mutual Bank_____ (the "Lender") of the same date and
covering the property described in the Security Instrument and located at:

_____19318 99TH AVE SE, SNOHOMISH, WA 98296_____
(Property Address)

THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST
RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL
HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY
BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE
THAN __125%___ OF THE ORIGINAL AMOUNT (OR $____708,750.00_____).
MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND
RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid.
Up until the first day of the calendar month that immediately precedes the first payment due date
set forth in Section 3 of the Note, I will pay interest at a yearly rate of __4.851__%. Thereafter
until the first Change Date (as defined in Section 4 of the Note) I will pay interest at a yearly rate
of __1.750___%. The interest rate I will pay will thereafter change in accordance with Section 4
of the Note.
Section 4 of the Note provides for changes in the interest rate and monthly payment as
follows:

32843 (11-01)                              **Page 1 of 5**

01-0836-068544776-5

## 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the _____1st_____ day of
_____June, 2005_____, and on that day every month thereafter.  Each such day
is called a "Change Date".

### (B) The Index

On each Change Date, my interest rate will be based on an Index.  The "Index" is the
Twelve-Month Average, determined as set forth below, of the annual yields on actively traded
United States Treasury Securities adjusted to a constant maturity of one year as published by the
Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates
(H.15)" (the "Monthly Yields").  The Twelve-Month Average is determined by adding together the
Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Change Date is
called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based
upon comparable information.  The Note Holder will give me notice of this choice.

### (C) Interest Rate Change

Before each Change Date, the Note Holder will calculate my new interest rate by adding
_____Two & Sixty-Eight-Hundredths_____ percentage points _2.680_ %
("Margin") to Current Index.  The Note Holder will then round the result of this addition to the
nearest one thousandth of one percentage point (0.001%).  Subject to the limits stated in Section
4(D) below, this rounded amount will be my new interest rate until the next Change Date.  In the
event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined.  The
new Margin will be the difference between the average of the old Index for the most recent three
year period which ends on the last date the Index was available plus the Margin on the last date
the old Index was available and the average of the new Index for the most recent three year
period which ends on that date (or if not available for such three year period, for such time as it is
available).  The difference will be rounded to the next higher 1/8 of 1%.

### (D) Interest Rate Limit

My interest rate will never be greater than _9.950_ % ("Cap"), except that following any
sale or transfer of the property which secures repayment of this Note after the first interest rate
Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points
greater than the interest rate in effect at the time of such sale or transfer.

### (E) Payment Change Dates

Effective every year commencing _____June 1, 2006_____, and on the same
date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the

01-0836-068544776-5

amount of the monthly payment that would be sufficient to repay the projected Principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the Principal Payment and does not apply to any escrow payments Lender may require under the Security Instrument.

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a Principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to __125%__ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that __125%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the __FIFTH__ anniversary of the due date of the first monthly payment, and on that same day every __FIFTH__ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my

01-0836-068544776-5

monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid "Principal."

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement , the intent of which is the transfer of title by Borrower at a future date to a purchaser. If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person)  without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if:  (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the

32843 (11-01)                                    **Page 4 of 5**

01-0836-068544776-5

transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

X _____
JOHN R WILSON

X _____
JACQUELINE M WILSON

32843 (11-01)                           **Page 5 of 5**

# DECLARATION

# EXHIBIT 2

AFTER RECORDING RETURN TO:

Washington Mutual Bank
C/O ACS IMAGE SOLUTIONS
12691 PALA DRIVE - MS156DPCA
GARDEN GROVE, CA 92841

# SECURITY INSTRUMENT COVER SHEET

01-0836-068544776-5

---

Please print or type information
Document Title(s) (or transactions contained therein):

1. Deed of Trust

---

Grantor/Trustor/Mortgagor(s) (Last name first, then first name and initials)

1. JOHN R WILSON

2. JACQUELINE M WILSON

3.

4.

5. ☐   Additional names on page _____ of document.

---

Grantee/Beneficiary/Mortgagee(s)

1. Washington Mutual Bank

---

Legal Description (abbreviated: i.e. lot, block, plat or section, township, range)

THE SOUTH 158 FEET OF TRACT 237 CATHCHART DIVISION NO. 1, SNOHOMISH COUNTY ACCORDING TO THE PLAT THEREOF, RECORDED IN VOLUME 9 OF PLATS. PAGE 44 THROUGH 47, INCLUSIVE, RECORDS OF SNOHOMISH COUNTY, WASHINGTON.

☐   Additional legal is on page _____ of document.

---

Assessor's Property Tax Parcel/Account Number(s)

1. 00403900023703           2.

3.                          4.

---

This document prepared by:

NANCY ABBOTT
3060 139TH AVE SE, STE 401
BELLEVUE, WA 98005

2636 (12-00)

AFTER RECORDING RETURN TO:

Washington Mutual Bank
C/O ACS IMAGE SOLUTIONS
12691 PALA DRIVE - MS156DPCA
GARDEN GROVE, CA 92841

——————————— [Space Above This Line For Recording Data] ———————————

talon group 522233

# DEED OF TRUST

01-0836-068544776-5

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated _____ April 22, 2005 _____, together with all Riders to this document.

**(B) "Borrower"** is __JOHN R WILSON and JACQUELINE M WILSON, husband and wife__

Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is _____ Washington Mutual Bank, a Washington corporation _____. Lender is a _____ Bank _____ organized and existing under the laws of __Washington__ . Lender's address is _____ 1201 Third Avenue Seattle, WA 98101 _____. Lender is the beneficiary under this Security Instrument.

**(D) "Trustee"** is _____ talon group, a California corporation _____.

**(E) "Note"** means the promissory note signed by Borrower and dated ____ April 22, 2005 ____. The Note states that Borrower owes Lender __Five Hundred Sixty-Seven Thousand & 00/100__

Dollars (U.S. $ ____ 567,000.00 ____ ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than _____ May 1, 2045 _____.

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

WASHINGTON
1529 (04-01)                         Page 1 of 17

01-0836-068544776-5

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [x] Adjustable Rate Rider
- [ ] Graduated Payment Rider
- [ ] Balloon Rider
- [ ] Other(s) [specify]

- [ ] Condominium Rider
- [ ] Planned Unit Development Rider
- [ ] Rate Improvement Rider

- [ ] 1-4 Family Rider
- [ ] Biweekly Payment Rider
- [ ] Second Home Rider

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds, whether by way of judgment, settlement or otherwise, paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note; and (iii) the performance of all agreements of borrower to pay fees and charges arising of the Loan whether or not herein set forth. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power

01-0836-068544776-5

of sale, the following described property located in _____ Snohomish _____ County, Washington:

THE SOUTH 158 FEET OF TRACT 237 CATHCHART DIVISION NO. 1, SNOHOMISH COUNTY ACCORDING TO THE PLAT THEREOF, RECORDED IN VOLUME 9 OF PLATS. PAGE 44 THROUGH 47, INCLUSIVE, RECORDS OF SNOHOMISH COUNTY, WASHINGTON.

which currently has the address of  19318 99TH AVE SE
                                                                                [Street]

_____ SNOHOMISH _____ , Washington _____ 98296 _____ ("Property Address"):
          [City]                                                       [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one of more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic

01-0836-068544776-5

Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance of the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke

the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

01-0836-068544776-5

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage.  Lender may purchase such insurance from or through any company acceptable to Lender including, without limitation, an affiliate of Lender, and Borrower acknowledges and agrees that Lender's affiliate may receive consideration for such purchase. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such polices shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

Borrower hereby absolutely and irrevocably assigns to Lender all of Borrower's right, title and interest in and to all proceeds from any insurance policy (whether or not the insurance policy was required by Lender) that are due, paid or payable with respect to any damage to such property, regardless of whether the insurance policy is established before, on or after the date of this Security instrument.  By absolutely and irrevocably assigning to Lender all of Borrower's rights to receive any and all proceeds from any insurance policy, Borrower hereby waives, to the full extent allowed by law, all of Borrower's rights to receive any and all of such insurance proceeds.

Borrower hereby absolutely and irrevocably assigns to Lender all of Borrower's right, title and interest in and to (a) any and all claims, present and future, known or unknown, absolute or contingent, (b) any and all causes of action, (c) any and all judgments and settlements (whether through litigation, mediation, arbitration or otherwise), (d) any and all funds sought against or from any party or parties whosoever, and (e) any and all funds received or receivable in connection with any damage to such property, resulting from any cause or causes whatsoever,

including but not limited to, land subsidence, landslide, windstorm, earthquake, fire, flood or any other cause.

Borrower agrees to execute, acknowledge if requested, and deliver to Lender, and/or upon notice from Lender shall request any insurance agency or company that has issued any insurance policy to execute and deliver to Lender, any additional instruments or documents requested by Lender from time to time to evidence Borrower's absolute and irrevocable assignments set forth in this paragraph.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, or remove or demolish any building thereon, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in good condition and repair in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property in good and workman like manner if damaged to avoid further

deterioration or damage. Lender shall, unless otherwise agreed in writing between Lender and Borrower, have the right to hold insurance or condemnation proceeds. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause. Lender does not make any warranty or representation regarding, and assumes no responsibility for, the work done on the Property, and Borrower shall not have any right to rely in any way on any inspection(s) by or for Lender or its agent. Borrower shall be solely responsible for determining that the work is done in a good, thorough, efficient and workmanlike manner in accordance with all applicable laws.

Borrower shall (a) appear in and defend any action or proceeding purporting to affect the security hereof, the Property or the rights or powers of Lender or Trustee; (b) at Lender's option, assign to Lender, to the extent of Lender's interest, any claims, demands, or causes of action of any kind, and any award, court judgement, or proceeds of settlement of any such claim, demand or cause of action of any kind which Borrower now has or may hereafter acquire arising out of or relating to any interest in the acquisition or ownership of the Property. Lender and Trustee shall not have any duty to prosecute any such claim, demand or cause of action. Without limiting the foregoing, any such claim, demand or cause of action arising out of or relating to any interest in the acquisition or ownership of the Property may include (i) any such injury or damage to the Property including without limit injury or damage to any structure or improvement situated thereon, (ii) or any claim or cause of action in favor of Borrower which arises out of the transaction financed in whole or in part by the making of the loan secured hereby, (iii) any claim or cause of action in favor of Borrower (except for bodily injury) which arises as a result of any negligent or improper construction, installation or repair of the Property including without limit, any surface or subsurface thereof, or of any building or structure thereon or (iv) any proceeds of insurance, whether or not required by Lender payable as a result of any damage to or otherwise relating to the Property or any interest therein. Lender may apply, use or release such monies so received by it in the same manner as provided in Paragraph 5 for the proceeds of insurance.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting

and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage

01-0836-068544776-5

insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or

01-0836-068544776-5

loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgement, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgement, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** This Security Instrument cannot be changed or modified except as otherwise provided herein or by agreement in writing signed by Borrower, or any successor in interest to Borrower and Lender. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy. No waiver by Lender of any right under this Security Instrument shall be effective unless in writing. Waiver by Lender of any right granted to Lender under this Security Instrument or of any provision of this Security Instrument as to any transaction or occurrence shall not be deemed a waiver as to any future transaction or occurrence.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by

Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Borrower shall pay such other charges as Lender may deem reasonable for services rendered by Lender and furnished at the request of Borrower, any successor in interest to Borrower or any agent of Borrower. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

01-0836-068544776-5

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgement enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a

01-0836-068544776-5

sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substance in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use, or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

01-0836-068544776-5

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.  If Borrower or any successor in interest to Borrower files (or has filed against Borrower or any successor in interest to Borrower) a bankruptcy petition under Title II or any successor title of the United States Code which provides for the curing of prepetition default due on the Note, interest at a rate determined by the Court shall be paid to Lender on post-petition arrears.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender or the Trustee (whether or not the Trustee is affiliated with Lender) may charge such person or persons a fee for reconveying the Property, but only if the fee is not prohibited by Applicable Law.

01-0836-068544776-5

**24. Substitute Trustee.** In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law. Trustee may destroy the Note and the Security Instrument three (3) years after issuance of a full reconveyance or release (unless directed in such request to retain them).

**25. Use of Property.** The Property is not used principally for agricultural purposes.

**26. Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

X _____
JOHN R WILSON

X _____
JACQUELINE M WILSON

01-0836-068544776-5

———————— (Space Below This Line For Acknowledgment) ————————

STATE OF WASHINGTON
~Snohomish~ County ss:

    On this 25th day of April 2005 , before me the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared John R Wilson and Jacqueline M. Wilson

to me known to be the individual(s) described in and who executed the foregoing instrument, and acknowledged to me that he/she/they signed and sealed the said instrument as his/her/their free and voluntary act and deed, for the uses and purposes therein mentioned.
    WITNESS my hand and official seal affixed the day and year in this certificate above written.

My Commission expires: 10/9/2008

Notary Public in and for the State of Washington residing at:

JANIE L. CURTIS
NOTARY PUBLIC
STATE OF WASHINGTON
COMMISSION EXPIRES
OCTOBER 9, 2008

# DECLARATION
# EXHIBIT 3

Chase Home Finance LLC (FL5-7730)
PO BOX 44090
Jacksonville, FL 32231-4090

February 28, 2011



000544

JACQUELINE M WILSON
19318   99TH AVE SE
SNOHOMISH   WA   98296

**Acceleration Warning (Notice of Intent to Foreclose)**
Account: 0685447765 (the "Loan")
Property Address:      19318  99th Ave Se
                       Snohomish  WA 98296 (the "Property")

Dear Jacqueline M. Wilson:

Under the terms of the Mortgage or Deed of Trust ("Security Instrument") securing your Loan, Chase Home Finance LLC ("Chase") hereby notifies you of the following:

1.   You are in default because you have failed to pay the required monthly installments commencing with the payment due 01/01/2011.

2.   As of February 28, 2011, total monthly payments (including principal, interest, and escrow if applicable), late fees, insufficient funds (NSF) fees, and other fees and advances due under the terms of your loan documents in the total amount of $5264.07 are past due. This past-due amount is itemized below. If applicable, your account may have additional escrow amounts that have been paid out and are due on the Loan. If you have any questions about the amounts detailed below, please contact us as soon as possible at (800) 848-9380.

| | |
|---|---|
| Total Monthly Payments | $4930.90 |
| Late Fees | $308.17 |
| NSF Fees | $25.00 |
| Other Fees* | $0.00 |
| Advances* | $0.00 |
| | |
| Amount Held in Suspense | $0.00 |

*Other Fees and Advances include those amounts allowed by your Note and Security Instrument. If you need additional information regarding any of these amounts, please contact us at the number provided below.*

You are also responsible for paying any amounts that become due from the date of this letter through the expiration date set forth in Paragraph 3 below. These amounts may include, but are not limited to, taxes, insurance, inspection fees, and other fees, as permitted by applicable law.

If you have any reason to dispute the past-due amount listed above, or if you believe your Loan is current, please contact us at the number provided below.

3. Action required to cure the default: You must pay the Total Monthly Payments listed in Paragraph 2 within thirty-two (32) days from the date of this notice in order to cure this default. All late fees, NSF fees, and other fees and advances are still valid and will need to be repaid under the terms of your loan documents.

4. If you fail to cure the default within thirty-two (32) days from the date of this notice, Chase will accelerate the maturity of the Loan, terminate your credit line if the Loan provides for revolving advances, declare all sums secured by the Security Instrument immediately due and payable, and commence foreclosure proceedings, all without further notice to you. If this happens, Chase will be entitled to collect its expenses incurred in pursuing the remedies provided in the Security Instrument, which may include, but not be limited to, allowable foreclosure/attorney fees, and other expenses permitted by applicable law.

5. If permitted by applicable law, you have the right to reinstate after acceleration of the Loan and the right to bring a court action to assert the nonexistence of a default, or any other defense to acceleration, foreclosure, and sale. However, the amount required to reinstate may be higher than what is owed under Paragraph 2 above due to additional fees and charges that we are entitled to collect under the Loan, including attorney fees related to any foreclosure action we initiate.

6. The total amount due under Paragraph 2 above is required to be paid in the form of a cashier's check or certified funds and should be remitted to:

   Overnight/Regular Mail:     Chase Home Finance LLC
                               Mail Code OH4-7133
                               3415 Vision Drive
                               Columbus, OH 43219-6009

Except as required by law, we are under no obligation to accept less than the full amount owed. If you send us less than the full amount owed, we may in our sole discretion apply such partial payment to your Loan without waiving any default or waiving our right to accelerate the Loan and continue with foreclosure proceedings in accordance with Paragraph 4 above.

7. If you are unable to pay the amount past due, Chase has a variety of loss mitigation programs that might help you resolve your default and keep your home; however, we need to talk with you to discuss these options and determine which of them might be appropriate for your circumstances. Please call us as soon as possible at (800) 848-9380.

8. While the Loan remains in default, we will perform certain tasks to protect our interest in the Property, including visits to your Property at regular intervals during the default. This will be done to determine, as of the date of the inspection, the property condition, occupancy status, and possibly your plans for curing the default and paying this Loan on time. You should anticipate that any costs incurred by Chase will be added to the amount you now owe if permitted by your loan documents or applicable law.

Chase offers homeownership counseling services to borrowers in some areas. Counseling is also available through a variety of nonprofit organizations experienced in homeownership counseling and approved by the Secretary of Housing and Urban Development (HUD). A listing of such organizations may be obtained by calling HUD toll-free at (800) 569-4287 or at www.hud.gov.

Sincerely,
Collections Department
Chase Home Finance LLC
(800) 848-9380
(800) 582-0542 TDD / Text Telephone

# DECLARATION

# EXHIBIT 4

IV.     The sum owing on the obligation secured by the Deed of Trust is: The principal sum of **$621,451.52**, together with interest as provided in the Note from **12/1/2010** on, and such other costs, fees, and charges as are due under the Note, Deed of Trust, or other instrument secured, and as are provided by statute.

V.     The above-described real property will be sold to satisfy the expense of sale and the obligation secured by the Deed of Trust as provided by statute. Said sale will be made without warranty, expressed or implied, regarding title, possession or encumbrances on **4/21/2023**. The defaults referred to in Paragraph III must be cured by **4/10/2023** (11 days before the sale date), or by other date as permitted in the Note or Deed of Trust, to cause a discontinuance of the sale. The sale will be discontinued and terminated if at any time before **4/10/2023** (11 days before the sale), or by other date as permitted in the Note or Deed of Trust, the default as set forth in Paragraph III is cured and the Trustee's fees and costs are paid. Payment must be in cash or with cashiers or certified checks from a State or federally chartered bank. The sale may be terminated any time after the **4/10/2023** (11 days before the sale date) and before the sale, by the Borrower or Grantor or the holder of any recorded junior lien or encumbrance by paying the principal and interest, plus costs, fees and advances, if any, made pursuant to the terms of the obligation and/or Deed of Trust, and curing all other defaults.

VI.     A written Notice of Default was transmitted by the Beneficiary or Trustee to the Borrower(s) and Grantor(s) by both first class and certified mail, proof of which is in the possession of the Trustee; and the Borrower and Grantor were personally served, if applicable, with said written Notice of Default or the written Notice of Default was posted in a conspicuous place on the real property described in Paragraph I above, and the Trustee has possession of proof of such service or posting. The list of recipients of the Notice of Default is listed within the Notice of Foreclosure provided to the Borrower(s) and Grantor(s). These requirements were completed as of **10/17/2012**.

VII.     The Trustee whose name and address are set forth below will provide in writing to anyone requesting it, a statement of all costs and fees due at any time prior to the sale.

VIII.     The effect of the sale will be to deprive the Grantor and all those who hold by, through or under the Grantor of all their interest in the above-described property.

IX.     Anyone having any objections to this sale on any grounds whatsoever will be afforded an opportunity to be heard as to those objections if they bring a lawsuit to restrain the sale pursuant to RCW 61.24.130. Failure to bring such a lawsuit may result in a waiver of any proper grounds for invalidating the Trustee's sale.

X.     NOTICE TO OCCUPANTS OR TENANTS – The purchaser at the Trustee's Sale is entitled to possession of the property on the 20th day following the sale, as against the Grantor under the deed of trust (the owner) and anyone having an interest junior to the deed of trust, including occupants who are not tenants. After the 20th day following the sale the purchaser has the right to evict occupants who are not tenants by summary proceedings under Chapter 59.12 RCW. For tenant-occupied property, the purchaser shall provide a tenant with written notice in accordance with RCW 61.24.060.

**THIS NOTICE IS THE FINAL STEP BEFORE THE FORECLOSURE SALE OF YOUR HOME.**

You may be eligible for mediation. You have only 20 DAYS from the recording date of this notice to pursue mediation.

**DO NOT DELAY. CONTACT A HOUSING COUNSELOR OR AN ATTORNEY LICENSED IN WASHINGTON NOW** to assess your situation and refer you to mediation if you are eligible and it may help you save your home. See below for safe sources of help.

**SEEKING ASSISTANCE**

Housing counselors and legal assistance may be available at little or no cost to you. If you would like assistance in determining your rights and opportunities to keep your house, you may contact the following:

The statewide foreclosure hotline for assistance and referral to housing counselors recommended by the Housing Finance Commission: Toll-free: **1-877-894-HOME (1-877-894-4663)** or Web site: http://www.dfi.wa.gov/consumers/homeownership/post_purchase_counselors_foreclosure.htm

The United States Department of Housing and Urban Development: Toll-free: **1-800-569-4287** or National Web Site: http://portal.hud.gov/hudportal/HUD or for Local counseling agencies in Washington: http://www.hud.gov/offices/hsg/sfh/hcc/fc/index.cfm?webListAction=search&searchstate=WA&filterSvc=dfc

The statewide civil legal aid hotline for assistance and referrals to other housing counselors and attorneys: Telephone: **1-800-606-4819** or Web site: http://nwjustice.org/what-clear

**Additional information provided by the Trustee:** If you have previously been discharged through bankruptcy, you may have been released of personal liability for this loan in which case this letter is intended to exercise the noteholders rights against the real property only. The Trustee's Sale Number is WA-11-447711-SH.

**QUALITY MAY BE CONSIDERED A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE**

Dated: *12/5/22*

Quality Loan Service Corp. of Washington, as Trustee
By: Jeff Stenman, President

Trustee's Address:
Quality Loan Service Corp. of Washington
108 1st Ave South, Suite 450, Seattle, WA 98104

For questions call toll-free: (866) 925-0241     Trustee Sale Number: WA-11-447711-SH

Sale Line: 800-280-2832 or Login to: http://wa.qualityloan.com

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of: Washington )
County of: King )

On DEC 05 2022 before me, **Aili Stenman** a notary public, personally

appeared **Jeff Stenman** , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Washington that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.          **(Seal)**

Signature

AILI STENMAN
Notary Public
State of Washington
Commission # 20101179
My Comm. Expires Dec 13, 2023

# ATTENTION PROPERTY RESIDENTS

The foreclosure process has begun on this property, which may affect your right to continue to live in this property. Ninety days or more after the date of this notice, this property may be sold at foreclosure.

If you are the owner of the property, the purchaser will be entitled to possession of the property 20 days after the foreclosure sale.

Under Washington law, if you are renting this property, the new property owner may either give you a new rental agreement or provide you with a sixty-day notice to vacate the property. If the loan being foreclosed falls within certain guidelines, you may also have additional rights under Federal law.

You may wish to contact a lawyer or your local legal aid or housing counseling agency to discuss any rights that you may have.



# DECLARATION

# EXHIBIT 5



108 1st Ave South, Suite 450 • Seattle, Washington 98104 • (866) 925-0241

# Notice of Continuance of Trustee's Sale
# RCW 61.24.040(10)

TS Number:  WA-11-447711-SH

Trustor(s): JOHN R WILSON AND JACQUELINE M WILSON, HUSBAND AND WIFE

Trustee: QUALITY LOAN SERVICE CORPORATION F/K/A QUALITY LOAN SERVICE CORPORATION OF WASHINGTON

Property Address: 19318 99TH AVE SE, SNOHOMISH, WA 98296-5104

In compliance with RCW 61.24.040(10), you are hereby notified that the Trustee's Sale of the above-referenced Property has been postponed to **9:00 AM** on **5/5/2023 On the Steps in Front of the North Entrance to the Snohomish County Superior Courthouse, located at 3000 Rockefeller Avenue, Everett, WA 98201**. In further compliance with the statute, we also have caused or will cause this postponement to be announced by public proclamation at the time and place fixed for the sale, as stated in the Notice of Sale or previous Notice of Continuance of Trustee's Sale(s).

If you have any questions relative to this or any future postponements you may reach QUALITY LOAN SERVICE CORPORATION F/K/A QUALITY LOAN SERVICE CORPORATION OF WASHINGTON at (866) 925-0241 or the sales line at **800-280-2832**.

**QUALITY MAY BE CONSIDERED A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. TO THE EXTENT YOUR OBLIGATION HAS BEEN DISCHARGED OR IS SUBJECT TO THE AUTOMATIC STAY IN A BANKRUPTCY CASE, THIS NOTICE IS FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT CONSTITUTE A DEMAND FOR PAYMENT OR AN ATTEMPT TO COLLECT A DEBT AS YOUR PERSONAL OBLIGATION.**

John Wilson, ProSe, T: 206.854.6851, E: john.wilson.udi@gmail.com
19318 99th Ave SE, Snohomish, WA 98296

**FILED**

APR 28 2023

HEIDI PERCY
COUNTY CLERK
SNOHOMISH CO. WASH.

1
2

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## FOR THE COUNTY OF SNOHOMISH

3
4
5
6

| JOHN and JACQUELINE WILSON, a married couple | Case No. |
| Plaintiffs, | **23  2  03142  31** |
| vs. | **PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** |
| JPMORGAN CHASE, N.A., and QUALITY LOAN SERVICE CORP OF WASHINGTON | |
| Defendants | |

7
8
9
10
11
12
13

14    Plaintiffs' Move pursuant to RCW 7.40.020 for a Temporary Restraining Order.

15  As described in Plaintiffs' Complaint for Permanent

16    Injunction, Declaratory and Other Equitable Relief, Defendants routinely conduct

17  non-judicial foreclosures in Washington in which they seek to recover unrecoverable,

18  time-barred debts without informing homeowner/borrowers that the debts are

19  uncoverable and time-barred. These practices violate numerous statutory provisions in

20  Washington. If Defendants are allowed to utilize this practice in the non-judicial

21  foreclosure that is the subject of this litigation, Plaintiffs' will be irreparably harmed by

22  the sale of their home at public auction on June 5, 2023. To prevent this sale, Plaintiffs

23  respectfully requests that the Court grant a temporary restraining order of up to 14 days to

24  allow Plaintiffs time to schedule a permanent injunction hearing before the judge

25  assigned to this case as soon as is practical.

26
27
28  PLAINTIFFS' MOTION FOR A TEMPORARY
RESTRAINING ORDER

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com;  T: 206.854.6851

**WHEREFORE,** Plaintiffs bring this Motion.

DATED: April 28, 2023.

Respectfully submitted,

JOHN R. WILSON

JACQUELINE M. WILSON

PLAINTIFFS' MOTION FOR A TEMPORARY
RESTRAINING ORDER

2

John Wilson, pro se
19318 99th Ave SE, Snohomish, WA 98296
E: john.wilson.udi@gmail.com;  T: 206.854.6851

SUPERIOR COURT FOR THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SNOHOMISH

JOHN R. WILSON AND JACQUELINE |
M. WILSON, |
|
       Plaintiffs, |
|
|
       v. |
|
|
 JP MORGAN CHASE BANK, NA |
AND QUALITY LOAN SERVICE |
CORP. OF WASHINGTON; DOE DE |
FENDANTS 1 THROUGH 8 |
       Defendants |

CASE NO.

**23  2  03142  31**

**RESTRAINING ORDER**

The Restraining Order is set forth below:

It is Ordered that Defendants JP Morgan Chase Bank, NA and Quality Loan

Service Corporation of Washington appear at the Ex-parte Department of the Snohomish

County Superior Court on Friday, May 5, 2023 and show cause, if any, why the restraints

below should not be implemented for a period of fourteen (14) days from the date of the

issuance of this Order, and why the other relief, if any, requested in the motion should not

be granted.

If you disagree with any part of the motion, you must respond to the motion in

writing before the hearing and by the deadline for Snohomish County. At the hearing, the

court will consider written sworn affidavits or declarations. Oral testimony may not be

allowed. To respond you must: (1) file your documents with the court; (2) provide a copy

of those documents to the judge or commissioner's staff; (3) serve Plaintiffs with a copy

of your documents; and (4) complete your filing and service of documents within the

time period required by the local court rules in effect in Snohomish County.

Failure to appear may result in a Temporary Order being entered by the court that grants

the relief requested in the motion without further notice.

II    ORDER

It is Ordered:

This order shall expire 14 days from the date of its issuance, unless otherwise extended

by the Court. The filing of a bond or the posting of security is waived.

DATED this 4th day of May 2023 at _____ am.


_____

                                           Judge/Commissioner

*Please Note:* This was intended as Exhibit 4.
However, a Fedex copy error left off
the front page AND the back 2 pages - 2022 Signed & mailed
"Notice of Foreclosure" referred to
in the complaint  7. Recorded date: 12/16/22.

WHEN RECORDED MAIL TO:
Quality Loan Service Corp. of Washington
108 1st Ave South, Suite 450
Seattle, WA 98104

Trustee Sale No.: WA-11-447711-SH          SPACE ABOVE THIS LINE FOR RECORDER'S USE
Title Order No.: 110261212-WA-GSI

## NOTICE OF TRUSTEE'S SALE
Pursuant to the Revised Code of Washington 61.24, et seq.

Reference Number of Deed of Trust: **Instrument No. 200505020024**
Parcel Number(s): **4039-000-237-03**
Grantor(s) for Recording Purposes under RCW 65.04.015: **JOHN R WILSON AND JACQUELINE M WILSON, HUSBAND AND WIFE**
Current Beneficiary of the Deed of Trust and Grantee (for Recording Purposes under RCW 65.04.015): **JPMorgan Chase Bank, National Association**
Current Trustee of the Deed of Trust: **Quality Loan Service Corporation of Washington**
Current Loan Mortgage Servicer of the Deed of Trust: **JPMorgan Chase Bank, N.A.**

I.        NOTICE IS HEREBY GIVEN that Quality Loan Service Corp. of Washington, the undersigned Trustee, will on **4/21/2023**, at **9:00 AM On the Steps in Front of the North Entrance to the Snohomish County Superior Courthouse, located at 3000 Rockefeller Avenue, Everett, WA 98201** sell at public auction to the highest and best bidder, payable in the form of credit bid or cash bid in the form of cashier's check or certified checks from federally or State chartered banks, at the time of sale the following described real property, situated in the County of SNOHOMISH, State of Washington, to-wit:

**THE SOUTH 158 FEET OF TRACT 237 CATHCHART DIVISION NO. 1, SNOHOMISH COUNTY ACCORDING TO THE PLAT THEREOF, RECORDED IN VOLUME 9 OF PLATS. PAGE 44 THROUGH 47, INCLUSIVE, RECORDS OF SNOHOMISH COUNTY, WASHINGTON.**

More commonly known as: **19318 99TH AVE SE, SNOHOMISH, WA 98296**

Subject to that certain Deed of Trust dated 4/22/2005, recorded 5/2/2005, under **Instrument No. 200505020024** records of SNOHOMISH County, Washington, from **JOHN R WILSON AND JACQUELINE M WILSON, HUSBAND AND WIFE**, as grantor(s), to **TALON GROUP, A CALIFORNIA CORPORATION**, as original trustee, to secure an obligation in favor of **WASHINGTON MUTUAL BANK, A WASHINGTON CORPORATION**, as original beneficiary, the beneficial interest in which was subsequently assigned to **JPMorgan Chase Bank, National Association**, the Beneficiary, under an assignment recorded under Auditors File Number 201305230021

II.        No action commenced by the Beneficiary of the Deed of Trust as referenced in RCW 61.21.030(4) is now pending to seek satisfaction of the obligation in any Court by reason of the Borrower's or Grantor's default on the obligation secured by the Deed of Trust/Mortgage.

III.        The default(s) for which this foreclosure is made is/are as follows: Failure to pay when due the following amounts which are now in arrears: **$533,602.06.**

IV.     The sum owing on the obligation secured by the Deed of Trust is: The principal sum of **$621,451.52**, together with interest as provided in the Note from **12/1/2010** on, and such other costs, fees, and charges as are due under the Note, Deed of Trust, or other instrument secured, and as are provided by statute.

V.      The above-described real property will be sold to satisfy the expense of sale and the obligation secured by the Deed of Trust as provided by statute. Said sale will be made without warranty, expressed or implied, regarding title, possession or encumbrances on **4/21/2023**. The defaults referred to in Paragraph III must be cured by **4/10/2023** (11 days before the sale date), or by other date as permitted in the Note or Deed of Trust, to cause a discontinuance of the sale. The sale will be discontinued and terminated if at any time before **4/10/2023** (11 days before the sale), or by other date as permitted in the Note or Deed of Trust, the default as set forth in Paragraph III is cured and the Trustee's fees and costs are paid. Payment must be in cash or with cashiers or certified checks from a State or federally chartered bank. The sale may be terminated any time after the **4/10/2023** (11 days before the sale date) and before the sale, by the Borrower or Grantor or the holder of any recorded junior lien or encumbrance by paying the principal and interest, plus costs, fees and advances, if any, made pursuant to the terms of the obligation and/or Deed of Trust, and curing all other defaults.

VI.     A written Notice of Default was transmitted by the Beneficiary or Trustee to the Borrower(s) and Grantor(s) by both first class and certified mail, proof of which is in the possession of the Trustee; and the Borrower and Grantor were personally served, if applicable, with said written Notice of Default or the written Notice of Default was posted in a conspicuous place on the real property described in Paragraph I above, and the Trustee has possession of proof of such service or posting. The list of recipients of the Notice of Default is listed within the Notice of Foreclosure provided to the Borrower(s) and Grantor(s). These requirements were completed as of **10/17/2012**.

VII.    The Trustee whose name and address are set forth below will provide in writing to anyone requesting it, a statement of all costs and fees due at any time prior to the sale.

VIII.   The effect of the sale will be to deprive the Grantor and all those who hold by, through or under the Grantor of all their interest in the above-described property.

IX.     Anyone having any objections to this sale on any grounds whatsoever will be afforded an opportunity to be heard as to those objections if they bring a lawsuit to restrain the sale pursuant to RCW 61.24.130. Failure to bring such a lawsuit may result in a waiver of any proper grounds for invalidating the Trustee's sale.

X.      NOTICE TO OCCUPANTS OR TENANTS – The purchaser at the Trustee's Sale is entitled to possession of the property on the 20th day following the sale, as against the Grantor under the deed of trust (the owner) and anyone having an interest junior to the deed of trust, including occupants who are not tenants. After the 20th day following the sale the purchaser has the right to evict occupants who are not tenants by summary proceedings under Chapter 59.12 RCW. For tenant-occupied property, the purchaser shall provide a tenant with written notice in accordance with RCW 61.24.060.

**THIS NOTICE IS THE FINAL STEP BEFORE THE FORECLOSURE SALE OF YOUR HOME.**

You may be eligible for mediation. You have only 20 DAYS from the recording date of this notice to pursue mediation.

**DO NOT DELAY. CONTACT A HOUSING COUNSELOR OR AN ATTORNEY LICENSED IN WASHINGTON NOW** to assess your situation and refer you to mediation if you are eligible and it may help you save your home. See below for safe sources of help.

**SEEKING ASSISTANCE**

Housing counselors and legal assistance may be available at little or no cost to you. If you would like assistance in determining your rights and opportunities to keep your house, you may contact the following:

The statewide foreclosure hotline for assistance and referral to housing counselors recommended by the Housing Finance Commission: Toll-free: **1-877-894-HOME (1-877-894-4663)** or Web site: http://www.dfi.wa.gov/consumers/homeownership/post_purchase_counselors_foreclosure.htm

The United States Department of Housing and Urban Development: Toll-free: **1-800-569-4287** or National Web Site: http://portal.hud.gov/hudportal/HUD or for Local counseling agencies in Washington: http://www.hud.gov/offices/hsg/sfh/hcc/fc/index.cfm?webListAction=search&searchstate=WA&filterSvc=dfc

The statewide civil legal aid hotline for assistance and referrals to other housing counselors and attorneys: Telephone: **1-800-606-4819** or Web site: http://nwjustice.org/what-clear

**Additional information provided by the Trustee:** If you have previously been discharged through bankruptcy, you may have been released of personal liability for this loan in which case this letter is intended to exercise the noteholders rights against the real property only. The Trustee's Sale Number is WA-11-447711-SH.

**QUALITY MAY BE CONSIDERED A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE**

Dated: _12/5/22_

Quality Loan Service Corp. of Washington, as Trustee
By: Jeff Stenman, President

Trustee's Address:
Quality Loan Service Corp. of Washington
108 1st Ave South, Suite 450, Seattle, WA 98104

For questions call toll-free: (866) 925-0241     Trustee Sale Number: WA-11-447711-SH

Sale Line: 800-280-2832 or Login to: http://wa.qualityloan.com

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of: Washington )
County of: King )

On DEC 0 5 2022 before me, Aili Stenman a notary public, personally

appeared Jeff Stenman , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Washington that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.     (Seal)

Signature

AILI STENMAN
Notary Public
State of Washington
Commission # 20101179
My Comm. Expires Dec 13, 2023

# NOTICE OF FORECLOSURE
**Pursuant to the Revised Code of Washington,**
**Chapter 61.24 RCW**

T.S. No.: **WA-11-447711-SH**

The attached Notice of Trustee's Sale is a consequence of default(s) in the obligation to **JPMorgan Chase Bank, National Association,** the Beneficiary of your Deed of Trust and holder of the obligation secured thereby. Unless the default(s) is/are cured, your property will be sold at auction on **4/21/2023.**

To cure the default(s), you must bring the payments current, cure any other defaults, and pay accrued late charges and other costs, advances, and attorney's fees as set forth below by **4/10/2023** *(11 days before the sale date)* or by other date as permitted in the Note and Deed of Trust. To date, these arrears and costs are as follows:

| | Currently due to reinstate on: **12/5/2022** | Estimated amount due to reinstate on: **4/10/2023** (11 days before the date set for sale.) |
|---|---|---|
| Total payments from 1/1/2011 | $524,725.82 | $535,654.82 |
| Total late charges | $0.00 | $0.00 |
| Total advances | $7,925.20 | $7,925.20 |
| Trustee's Fee | $0.00 | $0.00 |
| Title Report | $0.00 | $0.00 |
| **Trustee's Expenses (Estimated Itemization):** | | |
| Additional Foreclosure Fees/Costs | $526.04 | $526.04 |
| Recording Fees | $205.00 | $205.00 |
| Service/Posting of Notices | $120.00 | $120.00 |
| Postage | $100.00 | $100.00 |
| Publication | $0.00 | $1,000.00 |
| **TOTALS** | **$533,602.06** | **$545,531.06** |

To pay off the entire obligation secured by your Deed of Trust as of **12/5/2022** you must pay a total of **$621,451.52** in principal, **$254,005.75** in interest, plus other costs and advances estimated to date in the amount of **$163,771.33**. From and after the date of this notice you must submit a written request to the Trustee to obtain the total amount to pay off the entire obligation secured by your Deed of Trust as of the payoff date.

As to the defaults which do not involve payment of money to the beneficiary of your Deed of Trust, you must cure each such default (as applicable). Listed below are the defaults which do not involve payment of money to the Beneficiary of your Deed of Trust. Opposite each such listed default is a brief description of the action necessary to cure the default (if applicable) and a description of the documentation necessary to show the default has been cured.

| Default | Description of Action Required to Cure and Documentation Necessary to Show Cure |
|---|---|
| Delinquent property taxes | Payment in full to Obligee evidenced by a proper receipt. |
| Insurance premiums | Payment in full to Obligee evidenced by a proper receipt. |
| Advances made on senior liens | Payment in full to Obligee evidenced by a proper receipt. |
| Taxes and/or insurance | Payment in full to Obligee evidenced by a proper receipt. |
| Trustee's fees and expenses | Payment in full of the above listed Trustee's Fee and Expenses. |
| Any attorney fees and court costs arising from or associated with the beneficiaries efforts to protect and preserve its security. | Payment in full to Obligee evidenced by a proper receipt. |

Any of the above defaults (if applicable) must be cured as a condition of reinstatement, including all sums that shall accrue through reinstatement or pay-off. Nothing in this notice shall be construed as a waiver of any fees owing to the Beneficiary under the Deed of Trust pursuant to the terms of the loan documents.

Trustee Sale Number: WA-11-447711-SH

You may reinstate your Deed of Trust and the obligation secured thereby at any time up to and including **4/10/2023** *(11 days before the sale date)*, or by other date as permitted in the Note and Deed of Trust, by paying the amount set forth or estimated above and by curing any other defaults described above. Of course, as time passes other payments may become due, and any further payments coming due and any additional late charges must be added to your reinstating payment. Any new defaults not involving payment of money that occur after the date of this notice must also be cured in order to effect reinstatement. In addition, because some of the charges can only be estimated at this time, and because the amount necessary to reinstate or to payoff the entire indebtedness may include presently unknown expenditures required to preserve the property or to comply with state or local law, it will be necessary for you to contact the Trustee before the time you tender reinstatement or the payoff amount so that you may be advised of the exact amount you will be required to pay.

Tender of payment or performance must be made to: JPMorgan Chase Bank, N.A.

Payment or performance may be mailed to or dropped off at:
Quality Loan Service Corp. of Washington
108 1st Ave South, Suite 450, Seattle, WA 98104

Phone: (866) 925-0241 ext. 5318
Sale Line: 800-280-2832 or Login to: http://wa.qualityloan.com

AFTER **4/10/2023**, OR BY OTHER DATE AS PERMITTED IN THE NOTE OR DEED OF TRUST, YOU MAY NOT BE ALLOWED TO REINSTATE YOUR DEED OF TRUST BY PAYING THE BACK PAYMENTS AND COSTS AND FEES AND CURING THE OTHER DEFAULTS AS OUTLINED ABOVE. The Trustee will respond to any written request for current payoff or reinstatement amounts within ten days of receipt of your written request. In such a case, you will only be able to stop the sale by paying, before the sale, the total principal balance **$621,451.52** plus accrued interest, costs and advances, if any, made pursuant to the terms of the documents and by curing the other defaults as outlined above.

You may contest this default by initiating court action in the Superior Court of the county in which the sale is to be held. In such action, you may raise any legitimate defenses you have to this default. A copy of your Deed of Trust and documents evidencing the security thereby are enclosed. You may wish to consult a lawyer. Legal action on your part may prevent or restrain the sale, but only if you persuade the court of the merits of your defense. You may contact the Department of Financial Institutions or the statewide civil legal aid hotline for possible assistance or referrals.

The court may grant a restraining order or injunction to restrain a trustee's sale pursuant to RCW 61.24.130 upon five days notice to the trustee of the time when, place where, and the judge before whom the application for the restraining order or injunction is to be made. This notice shall include copies of all pleadings and related documents to be given to the judge. Notice and other process may be served on the trustee at:

    NAME: Robert McDonald, Registered Agent for Quality Loan Service Corporation of Washington
    ADDRESS: 108 1st Ave. South, Suite 450, Seattle, Washington 98104
    TELEPHONE NUMBER: (866) 925-0241

If you do not reinstate the secured obligation and your Deed of Trust in the manner set forth above, or if you do not succeed in restraining the sale by court action, your property will be sold to satisfy the obligations secured by your Deed of Trust. The effect of such sale will be to deprive you and all those who hold by, through or under you of all interest in the property.

Attached as "Exhibit A" is a list of the recipients of the Notice of Default.

## QUALITY MAY BE CONSIDERED A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Trustee Sale Number: WA-11-447711-SH